## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| In re: | |
| CREEKSIDE CANCER CARE, LLC, EIN: 27-0468155 | Case No. 16-21943-MER |
| | Chapter 11 |
| Debtor. | |

## DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN OF REORGANIZATION OF CREEKSIDE CANCER CARE, LLC

Dated:  April 7, 2017

Michael J. Pankow, Esq.
Samuel M. Kidder, Esq.
BROWNSTEIN HYATT FARBER SCHRECK, LLP
410 17th Street, Suite 2200
Denver, Colorado 80202
Telephone: (303) 223-1100
Facsimile:  (303) 223-1111

**Attorneys for the Debtor**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1
    A.    Overview ................................................................................................ 1
    B.    Disclaimers and Limitations ................................................................ 1
    C.    Sources of Information for Disclosure Statement; Financial Reporting ........ 2
    D.    Brief Explanation of Chapter 11 .......................................................... 2
    E.    Definitions ............................................................................................ 2
    F.    Summary of Classification and Treatment of Claims ......................... 3
    G.    Parties Entitled to Vote on the Plan .................................................... 6
    H.    Voting Procedures and Confirmation Hearing .................................... 7
    I.    Effect of Confirmation of the Plan ...................................................... 7
    J.    Approval of the Disclosure Statement ................................................. 7

II.    GENERAL INFORMATION ABOUT THE DEBTOR ..................................... 7
    A.    Organizational History ........................................................................ 7
    B.    Summary of the Debtor's Business Prior to Asset Sale ...................... 7
        1.    Overview of Business .............................................................. 8
        2.    Financial Performance ............................................................ 8
        3.    Workforce ............................................................................... 9
    C.    Summary of Debtor's Assets and Liabilities ...................................... 9
        1.    Description of Debtor's Assets ................................................ 9
        2.    Description of Claims Against the Debtor ............................. 10
        3.    Description of Interests in the Debtor .................................... 13

III.    EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASE .......... 14

IV.    SIGNIFICANT EVENTS IN THE CHAPTER 11 CASE ................................ 15
    A.    Voluntary Petition; "First Day" Motions; Employment Applications;
        and  Bar Date Motion ........................................................................ 15
    B.    Accuray Relief From Stay Motion; Rule 2004 Investigation of
        Accuray ............................................................................................. 16

V.    DESCRIPTION OF THE PLAN ..................................................................... 16
    A.    Overview of the Plan ......................................................................... 17
    B.    Treatment of Unclassified Claims ..................................................... 17
        1.    Administrative Expense Claims ............................................. 17
        2.    Professional Fee Claims ........................................................ 17
        3.    Priority Tax Claims ................................................................ 17
    C.    Classification and Treatment of Claims and Interests ....................... 18
        1.    Class 1:  Priority Non-Tax Claims ........................................ 18
        2.    Class 2: MidFirst First Loan Secured Claim ......................... 18
        3.    Class 3: MidFirst Second Loan Secured Claims .................... 18
        4.    Class 4: CLS Secured Claim .................................................. 19
        5.    Class 5: Northeast Secured Claim .......................................... 19
        6.    Class 6: LiftForward Secured Claim ...................................... 20

        **-i-**

# TABLE OF CONTENTS

(continued)

**Page**

| | | | |
|---|---|---|---|
| | **7.** | **Class 7: Byline Secured Claim** | 20 |
| | **8.** | **Classes 8A-8L: Equipment Finance Secured Claims** | 20 |
| | **9.** | **Classes 9A and 9B: Accuray Claims** | 21 |
| | **10.** | **Class 10: General Unsecured Claims** | 21 |
| | **11.** | **Class 11: Guaranty Claims** | 21 |
| | **12.** | **Class 12: Membership Interests** | 21 |
| **D.** | | **Reorganization of Debtor** | 21 |
| **E.** | | **Conditions Precedent to Effectiveness of the Plan** | 23 |
| **F.** | | **Feasibility; Financial Projections; Distributions to Creditors** | 24 |
| **G.** | | **Cramdown** | 24 |
| **H.** | | **Federal Income Tax Consequences of the Plan** | 24 |
| VI. | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 25 |
| | **A.** | **Assumption or Rejection of Executory Contracts and Unexpired Leases.** | 25 |
| | **B.** | **Rejection Damages Claims.** | 25 |
| | **C.** | **Assumed Contracts; Cure of Defaults** | 26 |
| VII. | | MISCELLANEOUS PLAN PROVISIONS | 26 |
| | **A.** | **Post-Effective Date Fees and Expenses.** | 26 |
| | **B.** | **Post-Effective Date Statutory Fees.** | 27 |
| | **C.** | **Objections to Claims and Settlements** | 27 |
| | **D.** | **Disputed Claims** | 27 |
| | **E.** | **Retention of Jurisdiction** | 27 |
| | **F.** | **Other Provisions** | 27 |
| VIII. | | RISK FACTORS | 28 |
| IX. | | LIQUIDATION ANALYSIS | 28 |
| X. | | SOLICITATION OF ACCEPTANCE OF PLAN | 29 |

## I.       INTRODUCTION

### A.       Overview

Creekside Cancer Care, LLC ("**Creekside**" or the "**Debtor**") hereby submits this disclosure statement (the "**Disclosure Statement**") pursuant to 11 U.S.C. § 1125.

The purpose of this Disclosure Statement is to provide information allowing the Creditors and Interest Holders of the Debtor to make an informed vote on the *Chapter 11 Plan of Reorganization of Creekside Cancer Care, LLC* (the "**Plan**"), a copy of which is attached hereto as **Exhibit A**.  This Disclosure Statement describes the Plan and explains the Debtor's pre-bankruptcy operating and financial history, the events leading up to the commencement of this chapter 11 case, and the anticipated results if the Plan is confirmed and becomes effective.  This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain alternatives to the Plan and the manner in which Distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of claims entitled to vote under the Plan must follow for their votes to be counted.

The Plan is intended to preserve the Debtor's business as a going concern, retain the Debtor's employees and assets, and to restructure the Debtor's capital on structure.  Pursuant to the Plan, Holders of Secured Claims will retain their liens on and security interests in Collateral and will receive payments over time with a value as of the Effective Date equal to the amount of their Secured Claims.  Holders of Allowed General Unsecured Claims will be paid in full over a period of seven (7) years, in quarterly installments, at an interest rate of 5.75% per annum, such that the value of such payments, as of the Effective Date, is equal to the Allowed amount of the applicable General Unsecured Claim, as described in more detail in Section 5.22 of the Plan.  Dr. Kelley Simpson, the sole member of the Debtor, will own 100% of the membership interests in the Reorganized Debtor.

The Debtor believes that the Plan is the only viable means for preserving the Debtor's business operations and avoiding a piecemeal liquidation of its assets.  Thus, the Debtor filed the Plan to effectuate the transactions contemplated therein and maximize value for creditors and parties in interest.

### B.       Disclaimers and Limitations

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances of, and obtaining confirmation of, the Plan and may not be relied upon for any other purpose.

Creditors should note that amendments of a minor nature may be made to the Plan prior to Confirmation.  Amendments of that nature may be approved by the Bankruptcy Court at the Confirmation Hearing without re-solicitation of Creditors.

The descriptions of the Plan contained in this Disclosure Statement are summaries and are qualified in their entirety by reference to the Plan.  Each Creditor is encouraged to analyze the terms of the Plan carefully.

The statements contained in this Disclosure Statement are believed to be accurate as of the date of its filing unless another time is specified in the Disclosure Statement. They should not be construed as implying that there has been no change in the facts set forth since the date the Disclosure Statement was prepared and the materials relied upon in preparation of the Disclosure Statement were compiled. Counsel for the Debtor makes no representation as to the accuracy of the information contained in this Disclosure Statement.

This Disclosure Statement has been neither approved nor disapproved by the Securities and Exchange Commission (the "**SEC**") or any state securities regulator, and neither the SEC nor any state securities regulator has passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

### C.  Sources of Information for Disclosure Statement; Financial Reporting

Substantially all of the factual information utilized in this Disclosure Statement was obtained from information provided by the Debtor's management as well as its books, records, Statement of Financial Affairs, Schedules, and the claims register.

### D.  Brief Explanation of Chapter 11

The commencement of a bankruptcy case creates an estate composed of all the legal and equitable interests of the Debtor as of the date it files for bankruptcy protection. The Debtor filed its petition for chapter 11 relief on December 9, 2016. In a chapter 11 case, a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession" unless the Bankruptcy Court orders the appointment of a trustee. The principal purpose of a chapter 11 case is to permit the debtor to reorganize its business or liquidate its assets. To further that interest, the debtor or a party in interest will submit a plan as a proposal for ultimately satisfying the claims against the debtor.

### E.  Definitions

**Defined Terms In the Plan**. Various terms are defined in Article II of the Plan. These defined terms are also used in the Disclosure Statement and have the same meaning in this Disclosure Statement as set forth in the Plan.

**Other Terms**. The words "herein," "hereof," "hereto," "hereunder," and others of similar inference refer to the Disclosure Statement as a whole and not to any particular section, subsection, or clauses contained in the Disclosure Statement unless otherwise specified herein. A term used herein or elsewhere in the Disclosure Statement that is not defined herein or in the Plan shall have the meaning ascribed to that term, if any, in the Bankruptcy Code or the Bankruptcy Rules. The headings in the Plan and in this Disclosure Statement are only for convenience of reference and shall not limit or otherwise affect the provisions of the Plan.

**Exhibits**. All exhibits to the Plan and Disclosure Statement are incorporated into and are a part of the Plan and Disclosure Statement as if set forth in full herein.

018535\0005\15573140.2

### F.    Summary of Classification and Treatment of Claims

| Class | Status | Summary of Treatment under Plan | Estimated Distribution |
|---|---|---|---|
| Class 1 – Priority Non-Tax Claims | Impaired | Each holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction of such Claim, four quarterly payments totaling a value, as of the Effective Date, equal to the Allowed amount of such Claim. | 100% |
| Class 2 – MidFirst First Loan Secured Claim | Impaired | MidFirst shall retain its Liens in the Collateral securing the MidFirst First Loan Secured Claim, with such Liens attaching to the Collateral in the same relative priority as existed immediately prior to the Petition Date.  After the Effective Date, the MidFirst First Loan Secured Claim shall bear interest at a rate of 5.75% per annum calculated on the basis of a 365 day year.  The MidFirst First Loan Secured Claim shall be fully amortized over a 300 month period, with monthly payments in an amount to be set forth in the Plan Supplement, or such other amount set forth in the Confirmation Order. | 100% |
| Class 3 – MidFirst Second Loan Secured Claim | Impaired | MidFirst shall retain its Liens in the Collateral securing the MidFirst Second Loan Secured Claim, with such Liens attaching to the Collateral in the same relative priority as existed immediately prior to the Petition Date.  After the Effective Date, the MidFirst Second Loan Secured Claim shall bear interest at a rate of 5.75% per annum calculated on the basis of a 365 day year.  The MidFirst Second Loan Secured Claim shall be fully amortized over a 60 month period, with monthly payments in an amount to be set forth in the Plan Supplement, or such other amount set forth in the Confirmation Order. | 100% |
| Class 4 – CLS Secured Claim | Impaired | CLS shall retain its Liens in the Collateral securing the CLS Secured Claim, with such Liens attaching to the Collateral in the same relative priority as existed immediately prior to the Petition Date.  After the Effective Date, the CLS Secured Claim | 100% |

3

| Class | Status | Summary of Treatment under Plan | Estimated Distribution |
|---|---|---|---|
| | | shall bear interest at a rate of 3.43% per annum calculated on the basis of a 365 day year.  The CLS Secured Claim shall be fully amortized over a 192 month period, with monthly payments in an amount to be set forth in the Plan Supplement, or such other amount set forth in the Confirmation Order. | |
| Class 5 – Northeast Secured Claim | Impaired | Northeast shall retain its Liens in the Collateral securing the Northeast Secured Claim, with such Liens attaching to the Collateral in the same relative priority as existed immediately prior to the Petition Date.  After the Effective Date, the Northeast Secured Claim shall bear interest at a rate of 5.75% per annum calculated on the basis of a 365 day year.  The Northeast Secured Claim shall be fully amortized over a 120 month period, with monthly payments in an amount to be set forth in the Plan Supplement, or such other amount set forth in the Confirmation Order. | 100% |
| Class 6 – LiftForward Secured Claim | Impaired | LiftForward shall retain its Liens in the Collateral securing the LiftForward Secured Claim, with such Liens attaching to the Collateral in the same relative priority as existed immediately prior to the Petition Date.  Pursuant to that certain *Stipulation for Adequate Protection Payments*, dated as of March 23, 2017 (the "**LiftForward Stipulation**"), by and between the Debtor and LiftForward, in full and final satisfaction of the LiftForward Secured Claim, the Debtor shall make nine (9) monthly payments in the amount of $8,093.01 per month, with such payments to be made on or before the 27th day of each month.  For the avoidance of doubt, the number of monthly payments owing to LiftForward shall be reduced by the number of payments already made by the Debtor as of the Effective Date pursuant to the LiftForward Stipulation. | 100% |

018535\0005\15573140.2

| Class | Status | Summary of Treatment under Plan | Estimated Distribution |
|-------|--------|--------------------------------|------------------------|
| Class 7- Byline Secured Claim | Impaired | Byline shall retain its Liens in the Collateral securing the Byline Secured Claim, with such Liens attaching to the Collateral in the same relative priority as existed immediately prior to the Petition Date. Beginning on the first day of the first calendar month following the Effective Date, the Reorganized Debtor shall resume making regular monthly payments in the amount of $2,611.81, which is the amount of the monthly payment under the Byline Agreement. The Reorganized Debtor shall continue making such monthly payments on the first day of each month thereafter until expiration of the term of the Byline Agreement. The term of the Byline Agreement shall be extended by a number of months equal to the number of months for which the Debtor has not made monthly payments under the Byline Agreement as of the Effective Date. | 100% |
| Classes 8A-8L – Equipment Finance Secured Claims | Impaired | Holders of Equipment Finance Secured Claims shall retain their Liens in the Collateral securing their respective Claims, with such Liens attaching to the Collateral in the same relative priority as existed immediately prior to the Petition Date. After the Effective Date, the Equipment Finance Secured Claims shall bear interest at a rate of 6.0% per annum calculated on the basis of a 365 day year. The Equipment Finance Secured Claims shall be fully amortized over a 120 month period, with monthly payments in an amount to be set forth in the Plan Supplement, or such other amount set forth in the Confirmation Order. | 100% |
| Class 9A – Accuray Secured Claim | TBD | The treatment of the Accuray Secured Claim will be determined after the Debtor has completed discovery regarding the value and useful life of the Tomo. | TBD |
| Class 9B – Accuray Unsecured Claim | TBD | The treatment of the Accuray Unsecured Claim, if any, will be determined after the | TBD |

018535\0005\15573140.2

| Class | Status | Summary of Treatment under Plan | Estimated Distribution |
|---|---|---|---|
| | | Debtor has completed discovery regarding the value and useful life of the Tomo. | |
| Class 10 – General Unsecured Claims | Impaired | Holders of Allowed General Unsecured Claims will be paid in full, plus interest at the rate of 5.75%, in 28 quarterly installments.  The first such quarterly Distribution to Holders of Allowed General Unsecured Claims shall be made on the first day of the first calendar quarter beginning after the Effective Date, and the Reorganized Debtor shall continue making such Distributions on the first day of each calendar quarter (i.e., January 1st, April 1st, July 1st, October 1st) thereafter. | 100% |
| Class 11 – Guaranty Claims | Unimpaired | Upon the Effective Date, the Reorganized Debtor shall assume all of the Debtor's contingent obligations to Holders of the Guaranty Claims, and such Guaranty Claims shall be enforceable against the Reorganized Debtor to the same extent and on the same terms as such Claims would be enforceable against the Debtor but for the occurrence of the Effective Date.  The legal and equitable rights of Holders of Guaranty Claims are not Impaired by this Plan, and thus Holders of Claims in Class 11 are not entitled to vote on the Plan. | 100% |
| Class 12 – Membership Interests | Impaired | Simpson shall receive 100% of the Interests in the Reorganized Debtor. | N/A |

## G.     Parties Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan.  Creditors whose Claims are not Impaired by the Plan are deemed to accept the Plan under § 1126(f) of the Bankruptcy Code and are not entitled to vote.  Classes that receive or retain nothing under the Plan are deemed to reject the Plan and are not entitled to vote.  Under this Plan, the Holders of Claims or Interests in all Classes except for Class 11 are Impaired, and thus all Holders of Claims in Classes 1 through 10 and Class 12 are entitled to vote on the Plan.

018535\0005\15573140.2

### H.     Voting Procedures and Confirmation Hearing

After approval of the Disclosure Statement by the Bankruptcy Court, Creditors and Interest Holders will have an opportunity to vote on the Plan.  Voting will be by Class, as set forth in the Plan and described later in this Disclosure Statement.  For classes containing more than one Claim or Interest, a Class is deemed to have accepted the Plan if more than one-half of the Creditors or Interest Holders in number holding at least two-thirds of the aggregate amount of Claims or Interests voting elect to accept the Plan.

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for the purpose of voting on the Plan.  After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan.  For your vote to be counted, you must complete and sign your original Ballot and return it by _____, 2017, which is the last date set by the Court to vote on the Plan.

The Bankruptcy Court has set a hearing on Confirmation of the Plan and to consider objections to Confirmation, if any, for _____, 2017, at _____.  The Confirmation hearing will be held at the United States Bankruptcy Court for the District of Colorado, U.S. Custom House, Courtroom C, 721 19th Street, Denver, Colorado 80202.  At the hearing, the Bankruptcy Court will consider whether the Plan satisfies the requirements of the Bankruptcy Code.

### I.     Effect of Confirmation of the Plan

Confirmation of the Plan makes the Plan and its provisions binding on the Debtor, all Creditors, all Holders of Interests, and all other parties in interest, regardless of whether they have accepted or rejected the Plan.  As a result, Creditors may receive payment on their claims only in accordance with the Plan.  If confirmed, the Effective Date of the Plan is anticipated to be the 14th day after the Bankruptcy Court enters the Confirmation Order.

### J.     Approval of the Disclosure Statement

A decision by the Bankruptcy Court to approve this Disclosure Statement under Bankruptcy Code § 1125 is a finding that the Disclosure Statement contains information of a kind and in sufficient detail to enable a reasonable, hypothetical investor typical of holders of impaired claims to make an informed judgment about the Plan and is not a recommendation by the Bankruptcy Court either for or against the Plan.

## II.     GENERAL INFORMATION ABOUT THE DEBTOR

### A.     Organizational History

The Debtor was formed on June 30, 2009 as a Colorado limited liability company.  At all times since its founding, Dr. Charles Kelley Simpson and Matthew O'Rourke have been the sole member and Chief Executive Officer, respectively, of the Debtor.

### B.     Summary of the Debtor's Business Prior to Asset Sale

1.      **Overview of Business**

The Debtor is engaged in business as a cancer care and treatment center, doing business under the name "Colorado CyberKnife." The Debtor's principal place of business is located in Lafayette, Colorado. The Debtor owns a radiation center located at 120 Laramie Trail Road in Lafayette. The Debtor also leases a medical imaging facility located at 140 Laramie Trail Road in Lafayette; the Debtor leases the facility from Coal Creek Investment Leasing Company, LLC ("**CCILC**"), an entity that is owned by Dr. Simpson.

The Debtor provides a range of non-invasive radiation therapy treatment options to its patients. The Debtor's medical campus includes screening and treatment facilities.

The sole member of the Debtor is Dr. Simpson. Dr. Simpson also owns a company called Centennial Radiation Oncology, P.C. ("**Centennial**"). Centennial, not the Debtor, provides physician services to patients treated at the Debtor's facility. Such patients generally receive two invoices: one from Centennial for physician services, and one from the Debtor for use of equipment and related costs.

One of the primary treatment options offered by the Debtor is "CyberKnife" treatment, which is a non-invasive alternative to surgery for the treatment of both cancerous and non-cancerous tumors. Patients travel from all over the Rocky Mountain region and beyond to be treated by the Debtor's CyberKnife machine. Compared to alternative treatments that can take up to 9 weeks or dozens of sessions of radiation therapy, an entire CyberKnife treatment plan can be completed in four to five sessions of one hour or less. There are currently over 300 CyberKnife treatment systems located in the United States, 98% of which are in hospitals. The Debtor is a free-standing, non-hospital medical campus. Because it is a free-standing center, the Debtor is able to offer CyberKnife treatment at a significantly lower price than hospitals.

In addition to the CyberKnife, the Debtor also provides a more conventional radiation therapy treatment program using a TomoTherapyHD machine (the "**Tomo**"). The Debtor purchased the Tomo from Accuray in 2011. The Tomo generates approximately 10% of the Debtor's revenues. The Debtor's dispute with Accuray was a significant driver of the bankruptcy filing and is described in more detail below.

2.      **Financial Performance**

The Debtor's unaudited financial statements for the years ended December 31, 2015 and December 31, 2016, in each case prepared on an income tax basis rather than in accordance with generally accepted accounting principles (GAAP), are attached hereto as **Exhibit B**. Note that the financial statements in Exhibit B have been compiled, but not audited, by Anderson & Whitney P.C., the Debtor's accountant. In 2015, the Debtor's revenues were approximately $2.33 million. In 2016, revenues were approximately $1.54 million. During the first quarter of 2017, revenues were approximately $529,000, for an annualized pace of approximately $2.1 million. In recent months, the Debtor has experienced an uptick in consultations and treatments.

### 3. Workforce

As of the date of this Disclosure Statement, the Debtor employs five employees and regularly contracts with three independent contractors. The employees consist of a Chief Executive Officer (Mr. O'Rourke), two finance and billing personnel, a part-time nurse, and a receptionist. The independent contractors consist of a medical physicist and two equipment technicians. The Debtor does not anticipate material changes to its workforce on or after the Effective Date.

### C. Summary of Debtor's Assets and Liabilities

### 1. Description of Debtor's Assets

The most significant assets of the Debtor are summarized below. For a more detailed list of the Debtor's assets, refer to the Schedules A/B filed by the Debtor (Docket No. 49).

*Real Property*. The Debtor owns the real property and facility located at 120 Old Laramie Trail in Lafayette, CO. The most recent appraisal of the real property, performed in January 2016, appraised the property at $2,900,000. This appraisal was essentially a "shell and core" appraisal and did not ascribe value to the numerous improvements the Debtor has made in order to transform the building into a formally recognized Medicare Part B outpatient facility. The Debtor believes that the current market value of the real property is well in excess of $3 million.

*Equipment*. The Debtor owns numerous items of medical equipment and machinery, the most significant of which is the CyberKnife. The Debtor believes that the fairm market value of the CyberKnife is approximately $2.6 million. In total, the Debtor believes that its equipment (excluding the Tomo) has a fair market value of approximately $4.3 million, as set forth in more detail in the Debtor's Schedule B (Docket No. 49). The Debtor is currently conducting discovery to ascertain the fair market value of the Tomo.

*Cash and Accounts Receivable*. As of March 31, 2017, the cash balance in the Debtor's Guaranty Bank debtor-in-possession account was $81,810.94 and the balance in the Debtor's MidFirst checking account was $7,913.89. The Debtor also maintains a segregated "adequate assurance" deposit account pursuant to the Utilities Motion (as defined below), which had a balance of $3,542.78 as of March 31, 2017; moneys in the adequate assurance account will be released to the Reorganized Debtor upon the Effective Date. The Debtor also maintains a segregated account at Guaranty Bank into which it deposits reserves for payment of property taxes pursuant to the Cash Collateral Order (as defined below); as of March 31, 2017, the balance in that account is $11,000. As of March 31, 2017, the Debtor's accounts receivable totaled $375,550.47.

*Accuray Causes of Action*. The Debtor may possess potentially valuable Causes of Action against Accuray. The Accuray Causes of Action are described in more detail in Article III below.

## 2. Description of Claims Against the Debtor

The following summary of Claims against the Debtor is based on (i) the Debtor's Schedule D (Creditors Who Hold Claims Secured by Property) and Schedule E/F (Creditors Who Have Unsecured Claims), filed on the docket in this Case on December 23, 2016; and (ii) Proofs of Claim filed against the Debtor, as reflected in the Court's Claims Register.

### a. Administrative Expense Claims

Administrative Expense Claims are defined in the Plan as any right to payment constituting a cost or expense of the Chapter 11 Case under §§ 503(b), 507(a)(2), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Estate, any actual and necessary costs and expenses of operating the Debtor's business, any indebtedness or obligations incurred or assumed by the Debtor in connection with the conduct of its business or liquidation of its assets, any Professional Fee claim, and any fees or charges assessed against the Estate under § 1930 of Title 28 of the United States Code. Parties asserting Administrative Expense Claims (other than Professional Fee Claims) are required to file a motion for allowance of such Claim on or before the date that is 28 days after the Effective Date.

Administrative Expense Claims are not reflected in the Debtor's Schedules. The Debtor anticipates that Professional Fees will make up the vast majority of Allowed Administrative Expense Claims. As of the date of this Disclosure Statement, the Debtor has employed two professionals: Brownstein Hyatt Farber Schreck, LLP ("**BHFS**"), as bankruptcy counsel, and Anderson Whitney P.C., as tax accountant. Under the Plan, the deadline for such Professionals to file final fee applications shall be 45 days after the Effective Date. If such final fee applications are granted in full, it is anticipated that the total Professional Fees owing to such Professionals could range from $250,000 to $350,000 (or more), depending on the Case activity from the date hereof through the Effective Date.

Other than Professional Fees, the Debtor has paid its postpetition expenses in the ordinary course of business pursuant to the budget attached to the final cash collateral order (Docket No. 122). Accordingly, the Debtor does not anticipate any other Administrative Expense Claims. Indeed, no applications for allowance of Administrative Expense Claims have been filed in this Case to date.

### b. Priority Tax Claims

Priority Tax Claims are defined in the Plan as any Claim of a governmental unit of the kind entitled to priority in payment as specified in §§ 502(i) and 507(a)(8) of the Bankruptcy Code. As of the date of this Disclosure Statement, no Priority Tax Claims have been filed. The Internal Revenue Service initially filed a Priority Tax Claim in the amount of approximately $16,000, but has since amended its Proof of Claim and no longer asserts a Priority Tax Claim. *See* Proof of Claim No. 3-3.

### c. Priority Non-Tax Claims

10

Priority Non-Tax Claims are defined in the Plan as any Claim entitled to priority under § 507(a)(1), (4), (5), (6), or (7) of the Bankruptcy Code.  The Debtor is not aware of any outstanding Priority Non-Tax Claims.

      d.     Secured Claims

Due to the capital-intensive nature of the Debtor's business, there are numerous secured creditors.  The Debtor believes that all Holders of Secured Claims are fully secured, and the Plan treats all Secured Claims as fully secured.  The Secured Claims against the Debtor are summarized below:

*MidFirst Secured Claims (Classes 2 & 3)*: MidFirst holds two Secured Claims against the Debtor: the MidFirst First Loan Secured Claim and the MidFirst Second Loan Secured Claim. The MidFirst First Loan Secured Claim is secured by a lien and security interest in substantially all of the Debtor's assets, including a first lien in the Debtor's real property.  The MidFirst Second Loan Secured Claim is secured by a lien on substantially all personal property of the Debtor.  Pursuant to the Cash Collateral Order (as defined below), the Debtor has been making postpetition interest payments to MidFirst on account of both Claims.

*CLS Secured Claim (Class 4)*: CLS holds a Secured Claim against the Debtor arising from the CLS Loan Documents.  The CLS Secured Claim is secured by a lien and security interest in substantially all of the Debtor's assets, including a second lien in the Debtor's real property.

*Northeast Secured Claim (Class 5)*: Northeast holds a Secured Claim against the Debtor arising from the Northeast Loan Documents.  The Northeast Secured Loan is secured by a lien and security interest in substantially all of the Debtor's personal property.  Northeast asserts—and the Debtor does not dispute—that it holds a first priority security interest in the Debtor's CyberKnife equipment.

*LiftForward Secured Claim (Class 6)*: LiftForward holds a Secured Claim against the Debtor arising from the LiftForward Loan Documents.  The LiftForward Secured Claim is secured by a security interest in substantially all of the Debtor's personal property.  Pursuant to an agreement entered into between the Debtor and LiftForward (Docket No. 130), the parties agreed that the Debtor will satisfy the LiftForward Secured Claim in full by making nine (9) monthly payments of $8,093.01 each, commencing on March 27, 2017.  It is anticipated that as of the anticipated Effective Date of July 15, 2017, the Debtor will have made four such payments, with five monthly payments remaining to be made pursuant to the Plan.

*Byline Secured Claim (Class 7)*: Byline holds a Secured Claim against the Debtor arising from the Byline Agreement.  The Byline Secured Claim is secured by a security interest in substantially all personal property of the Debtor.  Pursuant to an agreement entered into between the Debtor and Byline, the parties agreed that the Debtor would make monthly payments to Byline in the amount of $2,611.81 until the amounts owing under the Byline Agreement have been paid in full.

*Equipment Finance Claims (Classes 8A-8L)*: numerous parties hold Secured Claims against the Debtor resulting from capital lease agreements.  Those claims are classified as

subclasses within Class 8 and are described below (collectively, the Secured Claims making up Classes 8A through 8L are referred to as the "**Equipment Finance Secured Claims**").

*Wells Fargo Secured Claim (Class 8A)*: Wells Fargo holds a Secured Claim against the Debtor arising from the Wells Fargo Agreement. The Wells Fargo Secured Claim is secured by a security interest in certain equipment owned by the Debtor, as set forth in the Wells Fargo Agreement.

*Ascentium Capital Secured Claim (Class 8B)*: Ascentium Capital holds a Secured Claim against the Debtor arising from the Ascentium Capital Agreement. The Ascentium Capital Secured Claim is secured by a security interest in certain equipment owned by the Debtor, as set forth in the Ascentium Capital Agreement.

*Everbank First Secured Claim (Class 8C)*: Everbank holds a Secured Claim against the Debtor arising from the Everbank First Agreement. The Everbank First Secured Claim is secured by a security interest in certain equipment owned by the Debtor, as set forth in the Everbank First Agreement.

*Everbank Second Secured Claim (Class 8D)*: Everbank holds a Secured Claim against the Debtor arising from the Everbank Second Agreement. The Everbank Second Secured Claim is secured by a security interest in certain equipment owned by the Debtor, as set forth in the Everbank Second Agreement.

*Everbank Third Secured Claim (Class 8E)*: Everbank holds a Secured Claim against the Debtor arising from the Everbank Third Agreement. The Everbank Third Secured Claim is secured by a security interest in certain equipment owned by the Debtor, as set forth in the Everbank Third Agreement.

*LEAF Secured Claim (Class 8F)*: LEAF holds a Secured Claim against the Debtor arising from the LEAF Agreement. The LEAF Secured Claim is secured by a security interest in certain equipment owned by the Debtor, as set forth in the LEAF Agreement.

*Phillips First Secured Claim (Class 8G)*: Phillips holds a Secured Claim against the Debtor arising from the Phillips First Agreement. The Phillips First Secured Claim is secured by a security interest in certain equipment owned by the Debtor, as set forth in the Phillips First Agreement.

*Phillips Second Secured Claim (Class 8H)*: Phillips holds a Secured Claim against the Debtor arising from the Phillips Second Agreement. The Phillips Second Secured Claim is secured by a security interest in certain equipment owned by the Debtor, as set forth in the Phillips Second Agreement.

*Phillips Third Secured Claim (Class 8I)*: Phillips holds a Secured Claim against the Debtor arising from the Phillips Third Agreement. The Phillips Third Secured Claim is secured by a security interest in certain equipment owned by the Debtor, as set forth in the Phillips Third Agreement.

*Royal Bank Secured Claim (Class 8J)*: Royal Bank holds a Secured Claim against the Debtor arising from the Royal Bank Agreement.  The Royal Bank Secured Claim is secured by a security interest in certain equipment owned by the Debtor, as set forth in the Royal Bank Agreement.

*Susquehanna Secured Claim (Class 8K)*: Susquehanna holds a Secured Claim against the Debtor arising from the Susquehanna Agreement.  The Susquehanna Secured Claim is secured by a security interest in certain equipment owned by the Debtor, as set forth in the Susquehanna Agreement.

*Western Equipment Secured Claim (Class 8L)*: Western Equipment holds a Secured Claim against the Debtor arising from the Western Equipment Agreement.  The Western Equipment Secured Claim is secured by a security interest in certain equipment owned by the Debtor, as set forth in the Western Equipment Agreement.

      e.      Accuray Claims

*Accuray Claims (Class 9A and 9B)*:  Accuray may hold unsecured Claims and/or a Secured Claim arising from the Accuray Agreement (defined below).  The amounts of the Accuray Unsecured Claims and the Accuray Secured Claims depend on, among other things, the value of the Tomo, which is the Collateral for the Accuray Secured Claim.  The Debtor is currently conducting discovery to ascertain the value of the Tomo.  The Debtor intends to amend the Plan to treat Accuray's Claims consistent with the Bankruptcy Code and the value of its Collateral.

      f.      Unsecured Claims

*General Unsecured Claims (Class 10)*:  Based on the Debtor's Schedules and the Proofs of Claim filed in the case, the total amount of General Unsecured Claims (excluding the Accuray Claims and the Guaranty Claims) is approximately $1,500,000.  The Debtor or the Reorganized Debtor, as applicable, intends to object to certain of the General Unsecured Claims; if successful, the total amount of Allowed General Unsecured Claims may be $1,200,000 or less.

*Guaranty Claims (Class 11)*: prior to the Petition Date, the Debtor guaranteed CCILC's payment obligations under CCILC's mortgage on the real property located at 140 Old Laramie Trail (which property the Debtor leases from CCILC).  FirstBank and CLS hold Guaranty Claims against the Debtor arising from the mortgage loan guaranty.

      **3.**      **Description of Interests in the Debtor**

The Debtor is a single-member limited liability company.  Dr. Kelley Simpson is the sole member of the Debtor and, if the Plan is confirmed, will be the sole member of the Reorganized Debtor.

018535\0005\15573140.2

## III.  **EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASE**

From 2011 (the Debtor's first year of full-scale operations) through late 2013, the Debtor was generally in sound financial health.  Revenues increased from approximately $2.4 million in 2011 to approximately $3.3 million in 2013.  After 2013, the Debtor experienced a decline in revenues.  The primary factors contributing to the decline are described below.

In late 2013, heavy rain and flooding along Colorado's Front Range severely disrupted the Debtor's operations.  Among other things, the vault housing the CyberKnife machine flooded, causing significant damage to the CyberKnife.  The Debtor's operations ceased entirely for about one week, and the CyberKnife was inoperable for weeks.  During this period, many patients who were scheduled to visit the Debtor's facility for consultations or treatments cancelled their visits, resulting in a loss of revenue for the Debtor.  This loss of patient revenue had a ripple effect, as it resulted in fewer return patient visits and depleted the Debtor's funds available for discretionary advertising spending, which in turn further reduced patient revenue.

In addition, the Debtor's business has been adversely affected by, among other things, a trend toward vertical integration of hospitals.  In recent years, doctors have been leaving their independent physician practices to join hospitals.  As a result, the Debtor has seen a decrease in referrals from independent physician practices.

Although the foregoing events and trends have had an overall negative effect on the Debtor's business, the primary driver of the Debtor's bankruptcy filing was the dispute with Accuray.  The Debtor was generally on good terms and current with the remainder of its creditors as of the Petition Date.  A summary of the Debtor's dispute with Accuray is set forth below.

The Tomo is a CT imaging and radiation treatment delivery system.  The Debtor purchased the Tomo from Accuray pursuant to that certain "Shared Ownership Agreement" dated as of September 30, 2011 (the "**Accuray Agreement**").  In connection therewith, Accuray promised to help the Debtor secure meetings with large private and government insurers as payors for the Debtor's services as a freestanding (not hospital-based) center.  Accuray also promised to make the Debtor's facility the national training site for the use of both the Tomo system and the CyberKnife system and to compensate the Debtor for the training visits.

Soon after the sale, Accuray terminated almost all of the executive and sales team on the Debtor's account and the new management team refused to honor the prior promises.  Accuray has not helped secure meetings with large insurers.  Nor has Accuray arranged for any week-long training sessions at the Debtor's facility.

Unsurprisingly in this light, the Tomo system has underperformed financial expectations and Accuray's representations.  The revenues generated by the Tomo—approximately 10% of the Debtor's total revenues—are just a fraction of the minimum monthly payments called for under the Accuray Agreement.

In light of the Tomo's poor performance and Accuray's failure to fulfill its promises, the Debtor has not made the monthly payments called for under the Accuray Agreement.  The Debtor has, however, paid Accuray over $330,000 since 2011 for service and repairs on the

14

Tomo and the CyberKnife.  In addition, as a show of good faith, Dr. Simpson paid Accuray nearly $500,000 in late June 2016 to purchase the vault surrounding the Tomo and reduce the balance owing under the Accuray Agreement.

After Dr. Simpson purchased the vault, Accuray told the Debtor that it would forbear from taking any action to collect amounts allegedly owed under the Accuray Agreement.  Just 45 days later, on August 12, 2016, Accuray filed a lawsuit against the Debtor in Boulder County District Court.  On November 7, 2016, Accuray filed an Amended Complaint seeking, *inter alia*, possession of the Tomo and money damages.  The Debtor filed counterclaims against Accuray, including for breach of contract.  A trial was set to commence on December 12, 2016, but the filing of this Bankruptcy Case stayed the litigation.

Accuray's impact on the Debtor potentially extends beyond the failures of the Tomo system.  In early 2014, top executives at Accuray approached the Debtor and raised the prospect of selling the Debtor's business to its competitors.  The Debtor told Accuray it had no interest in selling its business and cautioned Accuray that the Debtor's sensitive business information (patient volume, revenue, contract terms, and the like) must not be shared with competitors.  The Debtor is informed that Accuray nevertheless shared the Debtor's financial and other sensitive business information with the Debtor's competitors.  More recently, since this case has been pending, the Debtor is informed that Accuray has been covertly interfering with the Debtor's efforts to team with urologists to form a "multi-specialty" group.  The Debtor has reason to believe that Accuray has been disparaging the Debtor and attempting to dissuade the urologists from partnering with the Debtor.  Based on this and other conduct, the Debtor believes it may have claims against Accuray for, among other things, interference with contractual relations, interference with prospective economic advantage, breach of contract, or breach of fiduciary duty (the "**Accuray Causes of Action**").  The Accuray Causes of Action are preserved under the Plan and may be pursued by the Reorganized Debtor.

## IV.    SIGNIFICANT EVENTS IN THE CHAPTER 11 CASE

### A.    Voluntary Petition; "First Day" Motions; Employment Applications; and Bar Date Motion

*Voluntary Petition*.  On December 9, 2016, the Debtor filed its voluntary chapter 11 petition in the Bankruptcy Court and certain related disclosures, statements, and forms.  On December 28, 2016, the Debtor filed an amended petition to reflect that the Debtor is not a "health care business" within the meaning of section 101(27A) of the Bankruptcy Code.

*First Day Motions*.  On December 16, 2016, the Debtor filed the following "first day" motions: (i) *Expedited Motion of Debtor for Authority to Pay Certain Employee Obligations and Maintain and Continue Employee Benefits and Programs* (Docket No. 23); (ii) *Expedited Motion of Debtor for Entry of Order (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services [etc.]* (Docket No. 24); (iii) *Expedited Motion of Debtor for Authority to Continue Use of Existing Bank Account* (Docket No. 25); and (iv) *Expedited Motion of Debtor for Authority to Use Cash Collateral* (Docket No. 26).  The Court granted each of the first day motions (Docket Nos. 42, 44, 76 & 77).

*Final Cash Collateral Motion*. On February 10, 2017, the Debtor filed a motion for entry of a final cash collateral order. On March 10, 2017, the Court entered its order approving the Debtor's use of cash collateral on a final basis in accordance with the budget attached thereto (Docket No. 106) (the "**Cash Collateral Order**").

*Employment Applications*. On December 9, 2016, the Debtor filed its application to employ Brownstein Hyatt Farber Schreck, LLP ("**BHFS**") as bankruptcy counsel. On January 10, 2017, the Debtor filed its application to employ Anderson & Whitney, P.C. as tax accountant. Each of the foregoing employment applications was approved by the Court. *See* Docket Nos. 14 & 74.

*Bar Date Motion*. On January 12, 2017, the Debtor filed a motion to establish bar dates for filing proofs of claim in the Chapter 11 Case. *See* Docket No. 78. On January 13, 2017, the Court entered an order establishing June 7, 2017 as the deadline for governmental units (as defined in § 101(27) of the Bankruptcy Code) to file proofs of claim and March 8, 2017 as the bar date with respect to all other proofs of claim. *See* Docket No. 79.

### B.      Accuray Relief From Stay Motion; Rule 2004 Investigation of Accuray

On March 1, 2017, Accuray filed a *Motion for Relief From Automatic Stay or, Alternatively, for Adequate Protection* (Docket No. 115) (the "**Relief From Stay Motion**"). In the motion, Accuray asserted that the Tomo was depreciating in value and sought relief from the automatic stay as to the Tomo or, in the alternative, sought to require the Debtor to make adequate protection payments to Accuray. As "adequate protection," Accuray sought to force the Debtor to pay all arrearages under the Accuray Agreement. The Debtor objected to the Relief From Stay Motion on the grounds that, *inter alia*, the adequate protection sought by Accuray bore no relation to the actual depreciation on the Tomo.

At a hearing held on March 29, 2017, the Court denied the Relief From Stay Motion without prejudice. The Court also set a hearing for May 22, 2017 for the purpose of determining the nature of Accuray's interest. Accuray asserts that the Accuray Agreement is a "lease" and that Accuray is the owner of the Tomo. The Debtor asserts that the Accuray Agreement is a sales contract, that the Debtor owns the Tomo, and that Accuray's interest is an Article 9 security interest in the Tomo. The Court's determination on that issue will affect the treatment of Accuray's Claims under the Plan.

The Debtor is currently in the process of conducting discovery to ascertain, among other things, the value of the Tomo and its useful life. On March 31, 2017, the Debtor filed a motion seeking authority to conduct a Rule 2004 examination of Accuray. The Court granted the motion on April 3, 2017, and discovery is underway. Pursuant to the Rule 2004 examination, the Debtor is also seeking documents and testimony relevant to the Debtor's potential causes of action against Accuray.

### V.      DESCRIPTION OF THE PLAN

The entire text of the Plan has been provided with this Disclosure Statement. The following is a brief summary of certain provisions of the Plan; however, this summary is not comprehensive. The Plan and not the Disclosure Statement is the legally operative document

that controls the relationship between the Debtor and its Creditors and Interest Holders. Therefore, the Plan should be read carefully and independently of this Disclosure Statement. Creditors and Interest Holders are urged to consult with counsel and other professionals in order to fully resolve any questions concerning the Plan.

### A.   Overview of the Plan

The Plan is a relatively simple chapter 11 plan of reorganization.  The Plan is intended to preserve the Debtor's business as a going concern, retain the Debtor's employees and assets, and to restructure the Debtor's capital structure.  Pursuant to the Plan, Holders of Secured Claims will retain their liens on and security interests in Collateral and will receive payments over time with a present value equal to the amount of their Secured Claims.  Holders of Allowed General Unsecured Claims will be paid in full over a period of seven (7) years, in quarterly installments, at an interest rate of 5.75% per annum, as described in more detail in Section 5.22 of the Plan. Dr. Kelley Simpson, the sole member of the Debtor, will own 100% of the membership interests in the Reorganized Debtor.  Funding for all payments to be made under the Plan will come from the Reorganized Debtor's continued business operations.

### B.   Treatment of Unclassified Claims

#### 1.   Administrative Expense Claims

Any party who claims to hold an Administrative Expense Claim (other than a Claim for Professional Fees) shall file a motion seeking allowance of such Administrative Claim on or before the date that is 28 days after the Effective Date (the "Administrative Expense Claim Bar Date"), regardless of whether or not such party has previously asserted an Administrative Expense Claim in a proof of claim.  Except to the extent any entity entitled to payment of an Allowed Administrative Expense Claim has received payment on account of such Claim prior to the Effective Date or agrees to less favorable treatment, each Holder of an Allowed Administrative Expense Claim (other than a Claim for Professional Fees) shall receive Cash in an amount equal to such Allowed Claim by the later of either (i) the Effective Date or as soon thereafter as is reasonably practicable, or (ii) the date that is 14 days after the Administrative Expense Claim is Allowed.

#### 2.   Professional Fee Claims

All Professionals seeking payment of Professional Fees or reimbursement of expenses incurred through and including the Effective Date under § 503(b)(2), (3), (4) or (5) of the Bankruptcy Code ("Professional Fees") shall file their respective final applications on or before the date that is 45 days after the Effective Date.  Except to the extent that the Holder of a Professional Fees Claim agrees to different treatment, the Allowed Professional Fees shall be paid in full in Cash by the Reorganized Debtor as soon as practicable after such Claims are Allowed by the Bankruptcy Court.

#### 3.   Priority Tax Claims

Except to the extent any entity entitled to payment of any Allowed Priority Tax Claim has received payment on account of such Claim prior to the Effective Date, each Holder of an

018535\0005\15573140.2

Allowed Priority Tax Claim shall be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable, unless such Holder of an Allowed Priority Tax Claim agrees to different treatment.

C.     **Classification and Treatment of Claims and Interests**

1.     **Class 1:  Priority Non-Tax Claims**

Each holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction of such Claim, four quarterly payments totaling a value, as of the Effective Date, equal to the Allowed amount of such Claim.

2.     **Class 2: MidFirst First Loan Secured Claim**

MidFirst shall retain its Liens in the Collateral securing the MidFirst First Loan Secured Claim, with such Liens attaching to the Collateral in the same relative priority as existed immediately prior to the Petition Date.

The MidFirst First Loan Documents shall remain in full force and effect, except that the MidFirst First Loan Documents shall be modified as follows:

Principal Amount.  The MidFirst First Loan Secured Claim shall have a principal amount equal to the principal balance plus accrued interest as of the Petition Date, plus all amounts that have accrued on the MidFirst First Loan Secured Claim through and including the Effective Date.  The principal amount of the MidFirst First Loan Secured Claim shall be the amount set forth in the Plan Supplement, or such other amount set forth in the Confirmation Order.

Interest, Payments, and Maturity.   After the Effective Date, the MidFirst First Loan Secured Claim shall bear interest at a rate of 5.75% per annum calculated on the basis of a 365 day year.  The MidFirst First Loan Secured Claim shall be fully amortized over a 300 month period, with monthly payments in an amount to be set forth in the Plan Supplement, or such other amount set forth in the Confirmation Order.  The first such monthly payment shall be due and payable on the first day of the first calendar month following the Effective Date, and like payments will be made by the Reorganized Debtor on the first day of each month thereafter.

3.     **Class 3: MidFirst Second Loan Secured Claims**

MidFirst shall retain its Liens in the Collateral securing the MidFirst Second Loan Secured Claim, with such Liens attaching to the Collateral in the same relative priority as existed immediately prior to the Petition Date.

The MidFirst Second Loan Documents shall remain in full force and effect, except that the MidFirst Second Loan Documents shall be modified as follows:

Principal Amount.  The MidFirst Second Loan Secured Claim shall have a principal amount equal to the principal balance plus accrued interest as of the Petition Date, plus all amounts that have accrued on the MidFirst Second Loan Secured Claim through and including the Effective Date.  The principal amount of the MidFirst Second Loan Secured Claim shall be

18

the amount set forth in the Plan Supplement, or such other amount set forth in the Confirmation Order.

Interest, Payments, and Maturity.   After the Effective Date, the MidFirst Second Loan Secured Claim shall bear interest at a rate of 5.75% per annum calculated on the basis of a 365 day year.  The MidFirst Second Loan Secured Claim shall be fully amortized over a 60 month period, with monthly payments in an amount to be set forth in the Plan Supplement, or such other amount set forth in the Confirmation Order.  The first such monthly payment shall be due and payable on the first day of the first calendar month following the Effective Date, and like payments will be made by the Reorganized Debtor on the first day of each month thereafter.

### 4.      Class 4: CLS Secured Claim

CLS shall retain its Liens in the Collateral securing the CLS Secured Claim, with such Liens attaching to the Collateral in the same relative priority as existed immediately prior to the Petition Date.

The CLS Loan Documents shall remain in full force and effect, except that the CLS Loan Documents shall be modified as follows:

Principal Amount.   The CLS Secured Claim shall have a principal amount equal to the principal balance plus accrued interest as of the Petition Date, plus all amounts that have accrued on the CLS Secured Claim through and including the Effective Date.  The principal amount of the CLS Loan Secured Claim shall be the amount set forth in the Plan Supplement, or such other amount set forth in the Confirmation Order.

Interest, Payments, and Maturity.   After the Effective Date, the CLS Secured Claim shall bear interest at a rate of 3.43% per annum calculated on the basis of a 365 day year.  The CLS Secured Claim shall be fully amortized over a 192 month period, with monthly payments in an amount to be set forth in the Plan Supplement, or such other amount set forth in the Confirmation Order.  The first such monthly payment shall be due and payable on the first day of the first calendar month following the Effective Date, and like payments will be made by the Reorganized Debtor on the first day of each month thereafter.

### 5.      Class 5: Northeast Secured Claim

Northeast shall retain its Liens in the Collateral securing the Northeast Secured Claim, with such Liens attaching to the Collateral in the same relative priority as existed immediately prior to the Petition Date.

The Northeast Loan Documents shall remain in full force and effect, except that the Northeast Loan Documents shall be modified as follows:

Principal Amount.   The Northeast Secured Claim shall have a principal amount equal to the principal balance plus accrued interest as of the Petition Date, plus all amounts that have accrued on the Northeast Secured Claim through and including the Effective Date.  The principal amount of the Northeast Secured Claim shall be the amount set forth in the Plan Supplement, or such other amount set forth in the Confirmation Order.

19

Interest, Payments, and Maturity. After the Effective Date, the Northeast Secured Claim shall bear interest at a rate of 5.75% per annum calculated on the basis of a 365 day year. The Northeast Secured Claim shall be fully amortized over a 120 month period, with monthly payments in an amount to be set forth in the Plan Supplement, or such other amount set forth in the Confirmation Order. The first such monthly payment shall be due and payable on the first day of the first calendar month following the Effective Date, and like payments will be made by the Reorganized Debtor on the first day of each month thereafter.

### 6.      Class 6: LiftForward Secured Claim

LiftForward shall retain its Liens in the Collateral securing the LiftForward Secured Claim, with such Liens attaching to the Collateral in the same relative priority as existed immediately prior to the Petition Date.

Pursuant to that certain *Stipulation for Adequate Protection Payments*, dated as of March 23, 2017 (the "**LiftForward Stipulation**"), by and between the Debtor and LiftForward, in full and final satisfaction of the LiftForward Secured Claim, the Debtor shall make nine (9) monthly payments in the amount of $8,093.01 per month, with such payments to be made on or before the 27th day of each month. For the avoidance of doubt, the number of monthly payments owing to LiftForward shall be reduced by the number of payments already made by the Debtor as of the Effective Date pursuant to the LiftForward Stipulation.

### 7.      Class 7: Byline Secured Claim

Byline shall retain its Liens in the Collateral securing the Byline Secured Claim, with such Liens attaching to the Collateral in the same relative priority as existed immediately prior to the Petition Date.

The Byline Agreement shall remain in full force and effect, except that the Byline Agreement shall be modified as follows:

Maturity and Monthly Payments. Beginning on the first day of the first calendar month following the Effective Date, the Reorganized Debtor shall resume making regular monthly payments in the amount of $2,611.81, which is the amount of the monthly payment under the Byline Agreement. The Reorganized Debtor shall continue making such monthly payments on the first day of each month thereafter until expiration of the term of the Byline Agreement. The term of the Byline Agreement shall be extended by a number of months equal to the number of months for which the Debtor has not made monthly payments under the Byline Agreement as of the Effective Date.

### 8.      Classes 8A-8L: Equipment Finance Secured Claims

Classes 8A through 8L consist of the Equipment Finance Secured Claims. Under the Plan, each Holder of a Secured Claim in Class 8A-8L will retain its Liens in the Collateral securing its Secured Claim, with such Liens attaching to the Collateral in the same relative priority as existed immediately prior to the Petition Date.

After the Effective Date, each Equipment Finance Secured Claim shall bear interest at a rate of 6.0% per annum calculated on the basis of a 365 day year.  Each Equipment Finance Secured Claim will be fully amortized over a 60 month period, with monthly payments in an amount to be set forth in the Plan Supplement, or such other amount set forth in the Confirmation Order.  The principal amount of each Equipment Finance Secured Claim shall be the amount set forth in the Plan Supplement, or such other amount set forth in the Confirmation Order.

9.     **Classes 9A and 9B: Accuray Claims**

The treatment of Accuray's Claims will be determined following completion of the Debtor's discovery regarding, *inter alia*, the value and useful life of the equipment securing Accuray's Secured Claim.

10.     **Class 10: General Unsecured Claims**

Holders of Allowed General Unsecured Claims will be paid in full, plus interest at the rate of 5.75%, in 28 quarterly installments.  The first such quarterly Distribution to Holders of Allowed General Unsecured Claims shall be made on the first day of the first calendar quarter beginning after the Effective Date, and the Reorganized Debtor shall continue making such Distributions on the first day of each calendar quarter (*i.e.*, January 1st, April 1st, July 1st, October 1st) thereafter.

11.     **Class 11: Guaranty Claims**

Upon the Effective Date, the Reorganized Debtor shall assume all of the Debtor's contingent obligations to Holders of the Guaranty Claims, and such Guaranty Claims shall be enforceable against the Reorganized Debtor to the same extent and on the same terms as such Claims would be enforceable against the Debtor but for the occurrence of the Effective Date. The legal and equitable rights of Holders of Guaranty Claims are not Impaired by this Plan, and thus Holders of Claims in Class 11 are not entitled to vote on the Plan.

12.     **Class 12: Membership Interests**

Dr. Simpson shall receive 100% of the Interests in the Reorganized Debtor.

D.     **Reorganization of Debtor**

a.     Reorganized Debtor; Vesting of Estate Property and Causes of Action. The Plan contemplates the reorganization of the Debtor with it emerging from bankruptcy and continuing to operate its business as the Reorganized Debtor with a restructured balance sheet.  All of the property of the Estate and of the Debtor shall vest automatically in the Reorganized Debtor free and clear of any and all Claims, Liens, and Interests, except for those Claims, Liens, and Interests expressly provided for in the Plan pursuant to Bankruptcy Code sections 1141(b) and (c), without the need for any further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person or Entity.  For the avoidance of doubt, except as expressly set forth herein, all Causes of Action, including the Accuray Causes of Action, shall vest in the Reorganized Debtor upon the Effective

21

Date, and the Reorganized Debtor shall have the authority to prosecute such Causes of Action.  Upon the Effective Date, all Avoidance Claims shall be waived by the Estate and shall not vest in the Reorganized Debtor.

      b.    <u>Powers and Duties</u>.  In addition to any other powers described in the Plan, the powers and duties of the Reorganized Debtor consist of the following:

      i.    To take control of, preserve, and operate property of the Estate, subject to the terms of the Plan;

      ii.    To investigate and prosecute or abandon all Causes of Action belonging to or assertible by the Estate;

      iii.    To review, object to, seek equitable subordination of, or seek any other remedy with respect to Claims filed against the Debtor;

      iv.    To abandon, discontinue, dismiss, amend, settle, compromise, negotiate or otherwise resolve all disputes, including all Causes of Action and Objections to Claims;

      v.    To make Distributions on account of all Allowed Claims and Interests consistent with the terms of the Plan;

      vi.    To retain persons and professionals to assist in carrying out the powers and duties enumerated pursuant to the Plan;

      vii.    To enter into contracts as necessary to assist in carrying out the powers and duties enumerated pursuant to the Plan;

      viii.    To pay expenses incurred in carrying out the powers and duties enumerated pursuant to the Plan, including professional fees incurred after the Effective Date;

      ix.    To open and maintain bank accounts and deposit funds and draw checks and make disbursements in accordance with the Plan;

      x.    To effectuate any of the provisions in the Plan;

      xi.    At the appropriate time, to ask the Bankruptcy Court to enter the final decree; and

      xii.    To execute all documents appropriate to convey assets of the Estate consistent with the terms of the Plan.

      c.    <u>Discharge</u>.  Pursuant to sections 1141(a), (c), and (d) of the Bankruptcy Code, and notwithstanding any language to the contrary in such sections, except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, the distributions, rights and

018535\0005\15573140.2

treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, of Claims, Interests, and Causes of Action of any nature whatsoever by any Person or Entity, including any interest accrued on any Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtor, the Estate, or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtor before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt, right, or Interest is Filed or deemed Filed pursuant to Section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to Section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan, effective as of the Effective Date. Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, the Confirmation Order shall be a judicial determination of the complete and full discharge of all Claims and Interests by any Person or Entity, subject to the Effective Date occurring. Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all property of the Estate shall vest in the Reorganized Debtor, free and clear of all Claims and Interests of any Person or Entity and with the full and complete discharge of any and all Claims, Interests or Causes of Action of any Person or Entity.

        d.     <u>Exculpation</u>.  The Debtor and any of its employees, advisors, counsel, and agents, shall neither have nor incur any liability to any Holder of a Claim or Interest, or any party acting or asserting a claim through a Holder of a Claim, for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Debtor shall be entitled to rely upon the advice of counsel with respect to its duties and responsibilities under the Plan.

## E.    <u>Conditions Precedent to Effectiveness of the Plan</u>

The Plan shall not become effective unless and until the following have been satisfied or waived in accordance with Section 9.02 of the Plan:

        a.     The Confirmation Order, in form and substance reasonably satisfactory to the Debtor, shall have been entered by the Bankruptcy Court;

        b.     There is no stay or injunction in effect with respect to the Confirmation Order; and

c. 14 days shall have passed since the Confirmation Order has been entered by the Bankruptcy Court.

### F. Feasibility; Financial Projections; Distributions to Creditors

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor or plan proponent demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless the plan calls for liquidation. The Debtor's continued operations will generate sufficient cash flow to enable the Debtor to meet its obligations under the Plan.

Although the Debtor is still addressing issues related to the poor performance of the Tomo and disputes with Accuray, the Debtor believes that its business has stabilized and is on an upward trajectory. As noted, the Debtor has seen an uptick in patient volume in recent months. The Debtor expects to continue to benefit from the recent expansion in the percentage of the population on Medicaid and Medicare, as the Debtor is built to provide excellent care at a relatively low cost in an increasingly cost-sensitive industry. More generally, Colorado's population is growing rapidly, providing a larger pool of potential patients for the Debtor. In addition, Dr. Simpson's physician practice, Centennial Radiation Oncology, P.C., is in the process of forming a "multi-specialty group" practice with a team of urologists. A multi-specialty group practice affords the closer coordination of care of specialists within one practice in the interest of elevating the overall standard of care. The Debtor anticipates that the formation of the multi-specialty group will positively impact the Debtor's business prospects.

Attached hereto as **Exhibit C** are financial projections prepared by the Debtor's management for the seven-year period in which payments are projected to be made under the Plan. Projections are inherently uncertain, but Exhibit C represents the Debtor's best effort to project the results of operations for the Reorganized Debtor based on all facts and circumstances presently known to the Debtor.

### G. Cramdown

If any class of Claims fails to accept the Plan in accordance with § 1126(c) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan in accordance with § 1129(b) of the Bankruptcy Code on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to any non-accepting, impaired Class. The Plan satisfies the "absolute priority rule" insofar as holders of Interests will receive no Distributions unless and until all Allowed unsecured Claims are paid in full.

### H. Federal Income Tax Consequences of the Plan

**Any tax advice contained in this Disclosure Statement is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding tax-related penalties under the Internal Revenue Code of 1986, as amended. Any tax advice contained in this Disclosure Statement was written to support the promotion of the transactions described in this Disclosure Statement.**

The following discussion is not intended as a substitute for professional tax advice, including the evaluation of recently enacted and pending legislation, since recent changes in the federal income taxation of reorganizations under the Bankruptcy Code are complex and lack authoritative interpretation. The Debtor has not received, nor will it request, a ruling from the IRS as to any of the tax consequences of the Plan with respect to holders of Claims or Interests. The Debtor assumes no responsibility for the tax effect that Confirmation and receipt of any Distribution under the Plan may have on any given creditor or other party in interest. The Debtor recommends that Creditors and other parties in interest consult with their own tax advisors concerning the federal, state and local tax consequences of the Plan.

The Plan proposes repayment in full of all Claims. As a result, the Debtor does not expect to report cancellation of indebtedness income as a result of the Plan and the payments made thereunder. Because the Plan proposes 100% repayment of all Claims, Creditors may not need to alter the tax treatment of their Claims as a result of the Plan. Notwithstanding the foregoing, Creditors are strongly encouraged to consult with their own tax professionals regarding the tax consequences of the Plan.

To the extent that a Creditor receives payment pursuant to the Plan in an amount in excess of the Creditor's adjusted tax basis in the claim to which payment relates, the excess will be treated as income or gain to the Creditor. A Creditor not previously required to include in its taxable income any accrued but unpaid interest on a Claim may be treated as receiving taxable interest, to the extent the amount it receives pursuant to the Plan is allocable to such accrued but unpaid interest. A Creditor previously required to include in its taxable income any accrued but unpaid interest on a claim may be entitled to recognize a deductible loss, to the extent the amount of interest actually received by the Creditor is less than the amount of interest taken into income by the creditor.

## VI.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.   Assumption or Rejection of Executory Contracts and Unexpired Leases**. Any executory contract or unexpired lease that has not expired by its own terms on or prior to the Effective Date and that (i) the Debtor has not assumed and/or assigned or rejected with the approval of the Bankruptcy Court, (ii) is not identified as Assumed Contract, and (iii) is not the subject of a motion to assume the same pending as of the Effective Date, shall be deemed rejected by the Debtor, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

**B.   Rejection Damages Claims**. With respect to Claims arising from the rejection of executory contracts or unexpired leases pursuant to Section 7.01 of the Plan, the bar date to file Proofs of Claim in this Case shall be reopened for a period of 28 days after the Effective Date, and all such Proofs of Claim must be filed with the Bankruptcy Court during that time. Any such Claim that is Allowed by the Bankruptcy Court shall be treated as a Class 10 General Unsecured Claim. Any Claim arising from the rejection of an executory contract or unexpired lease pursuant to Section 7.01 of the Plan for which a Proof of Claim is not timely filed within that time period shall be forever barred from assertion against the Estate, the Debtor, the

Reorganized Debtor, their successors and assigns, or their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.

### C.     Assumed Contracts; Cure of Defaults.

Any monetary amounts by which each executory contract and unexpired lease to be assumed is in default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to each such Assumed Contract may otherwise agree.  Included in the Plan Supplement will be the list of Assumed Contracts to be assumed by the Reorganized Debtor pursuant to the Plan. The Plan Supplement will identify the executory contracts and unexpired leases sought to be assumed, the counterparties thereto, and the proposed cure payments as of the projected Effective Date.  The Debtor reserves the right to remove executory contracts or unexpired leases from such list or to modify the cure amounts executed in connection therewith at any time prior to the Confirmation Hearing.

Any objection to (a) the amount of any cure payments for the Assumed Contracts, (b) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, shall be filed and served on the Debtor on or before the deadline established by the Bankruptcy Court for filing objections to the Plan.  In the event an objection is filed, the Debtor shall attempt to resolve such objection prior to the Confirmation Hearing.   To the extent the parties are unable to consensually resolve such objection prior to the Confirmation Hearing, such objection and any cure amounts to be paid will be determined at the Confirmation Hearing or as otherwise agreed to by the parties or ordered by the Bankruptcy Court.

In the event that a dispute remains unresolved as of the Effective Date regarding (a) the amount of any cure payments, (b) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made within a reasonable time following the entry of a Final Order resolving the dispute and approving the assumption.  Pending the Bankruptcy Court's ruling on such dispute, the executory contract or unexpired lease at issue shall be deemed assumed by the Debtor unless otherwise ordered by the Bankruptcy Court.  However, any such "deemed" assumption shall not affect any counterparty's rights and/or remedies under section 365 of the Bankruptcy Code or otherwise, which shall be preserved pending final resolution notwithstanding the "deemed" assumption.

## VII.    MISCELLANEOUS PLAN PROVISIONS

### A.     Post-Effective Date Fees and Expenses.

From and after the Effective Date, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, the reasonable fees and expenses of professional persons incurred after the Effective Date by the Reorganized Debtor shall be paid by

the Reorganized Debtor, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan.

**B.      Post-Effective Date Statutory Fees.**

All fees payable pursuant to § 1930 of Title 28 of the United States Code incurred after the Effective Date shall be paid in accordance with applicable law.  The Reorganized Debtor shall submit post-confirmation reports in compliance with applicable law.

**C.      Objections to Claims and Settlements**

a.      After the Effective Date, Objections to Claims may be made, and Objections to Claims made previous thereto shall be pursued, only by the Reorganized Debtor.  The deadline for the Reorganized Debtor to file Objections to Claims shall be 180 days after the Effective Date, subject to extension by motion to the Court.  After the Effective Date, the Reorganized Debtor shall, without further order of the Bankruptcy Court, have the right to retain and compensate counsel or other professionals to assist with Objections to Claims or any other duties of the Reorganized Debtor under the Plan.

b.      After the Effective Date, the Reorganized Debtor may settle any Disputed Claims where the proposed Allowed Claim is to be less than $25,000 without notice and a hearing and without an order of the Bankruptcy Court.  All other settlements shall be subject to notice and a hearing pursuant to section 102(1) of the Bankruptcy Code and Bankruptcy Rule 9019.

**D.      Disputed Claims**

If any Claim is a Disputed Claim, no Distribution provided hereunder shall be made on account of such Claim unless and until said Disputed Claim becomes an Allowed Claim.  In the event any Distribution is made while there is an extant Disputed Claim, the Distribution that would be paid on account of the Disputed Claim shall be withheld until the Disputed Claim is Allowed or Disallowed.  If the Claim is Allowed, the Holder of the Allowed Claim will receive its withheld Distribution.  If the Claim is Disallowed, then any Distribution that was withheld with respect to such Claim shall be released to the Reorganized Debtor.

**E.      Retention of Jurisdiction**

The Plan contains a standard retention of jurisdiction provision.  *See* Plan Art. X.  In the event that the Reorganized Debtor defaults on any of its obligations under the Plan, the Bankruptcy Court shall retain jurisdiction to enforce the terms of the Plan.  *See id.* & § 8.05.

**F.      Other Provisions**

Creditors and other parties in interest are directed to the Plan with respect to the provisions that are not specifically discussed in this Disclosure Statement.

## VIII.   <u>RISK FACTORS</u>

As with any plan or other financial transaction, there are certain risk factors which must be considered.  It should be noted that all risk factors cannot be anticipated, that some events will develop in ways that were not foreseen and that many or all of the assumptions that have been used in connection with this Disclosure Statement and the Plan will not be realized exactly as assumed.  Some or all of such variations may be material.  While every effort has been made to be reasonable in this regard, there can be no assurance that subsequent events will bear out the analysis set forth herein.  Not all possible risks can be, or are discussed in this Disclosure Statement.  Under the Plan, some of the principal risks that Holders of Claims and Interests should be aware of, in the Debtor's view, are as follows:

- <u>Failure to Achieve Projected Financial Results</u>.  The financial projections set forth on Exhibit C to this Disclosure Statement represent the Debtor's management's best estimate of the Debtor's future financial performance based on currently known facts and assumptions about the Debtor's future operations as well as the economy in general and the industry segments in which the Debtor operates in particular.  The Reorganized Debtor's actual results may differ significantly from the financial projections.  If the Debtor does not achieve its projected financial results, the Debtor may not be able to make the payments to Creditors contemplated by the Plan.

- <u>Retention of Debtor's Management and Personnel</u>.  The Debtor's business depends upon the efforts, abilities, and expertise of the Debtor's management and personnel.  The Debtor anticipates that all management and personnel will continue to be employed by the Reorganized Debtor, but to the extent certain key employees cease to be employed and the Reorganized Debtor is unable to mitigate the resulting costs, the Reorganized Debtor's business could be impacted.

- <u>General Industry Risks</u>.  The healthcare industry is in a period of general instability in light of, among other things, the ongoing uncertainty regarding the Affordable Care Act.  It is possible that future legal or regulatory changes in the industry will have a material impact on the Debtor's operations.

## IX.   <u>LIQUIDATION ANALYSIS</u>

To confirm the Plan, the Court must determine (with certain exceptions) that the Plan provides each member of each Impaired class of Allowed Claims a recovery at least equal to the distribution that such member would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.  The trustee appointed in a chapter 7 case would make all of his or her own decisions with respect to the liquidation of the Estate, the hiring of professionals, the pursuit of any claims or litigation, and the payment or objection to Claims.

Attached hereto as **<u>Exhibit D</u>** is a liquidation analysis prepared by the Debtor's management showing estimated distributions to Creditors in the event of a chapter 7 liquidation.  As set forth in Exhibit D, the Debtor believes that Creditors will receive a significantly higher recovery under the Plan than they would in a chapter 7 liquidation.

018535\0005\15573140.2

## X.     <u>SOLICITATION OF ACCEPTANCE OF PLAN</u>

The Debtor hereby solicits acceptance of the Plan and urges its Creditors and Interest Holders to vote to accept the Plan.

[*The remainder of this page is intentionally left blank*]

April __7__, 2017

**CREEKSIDE CANCER CARE, LLC**

Debtor and Debtor-in-Possession

By:     Matthew O'Rourke, its CEO

By: _____
Name:  Matthew O'Rourke
Title:   Chief Executive Officer

APPROVED AS TO FORM:

**BROWNSTEIN HYATT FARBER SCHRECK, LLP**

By: _____
Michael J. Pankow, Esq.
Samuel M. Kidder, Esq.
410 17th Street, Suite 2200
Denver, CO 80202
Phone: (303) 223-1100
Fax: (303) 223-1111
Email: mpankow@bhfs.com
          skidder@bhfs.com

**Attorneys for the Debtor**

## EXHIBIT A

**CHAPTER 11 PLAN OF REORGANIZATION OF CREEKSIDE CANCER CARE, LLC**

**[FILED SEPARATELY]**

**<u>EXHIBIT B</u>**

**FINANCIAL STATEMENTS FOR YEARS ENDED 12/31/2015 AND 12/31/2016**

# CREEKSIDE CANCER CARE, LLC.

## FINANCIAL STATEMENTS
## AND
## ADDITIONAL INFORMATION
(Income Tax Basis)

Quarter and Year Periods Ended December 31, 2016

# TABLE OF CONTENTS

Independent Accountants' Compilation Report ...............................................................................1

STATEMENT OF ASSETS, LIABILITIES, AND MEMBER'S EQUITY - INCOME TAX BASIS ...............................................................................................................................................2

STATEMENT OF MEMBER'S EQUITY - INCOME TAX BASIS .............................................3

STATEMENTS OF REVENUE AND EXPENSES - INCOME TAX BASIS..............................4

STATEMENTS OF CASH FLOWS - INCOME TAX BASIS…………………………………...5

ADDITIONAL INFORMATION:

  Schedules of Operating Expenses - Income Tax Basis.................................................................7



A Professional Corporation of
Certified Public Accountants

Independent Accountant's Compilation Report

Creekside Cancer Care, LLC
LaFayette, Colorado

Management is responsible for the accompanying financial statements of Creekside Cancer Care, LLC, which comprise the statements of assets, liabilities, and member's equity—income tax-basis as of December 31, 2016  and the related statements of revenue and expenses—income tax-basis and cash flows—income tax-basis for the quarter and year then ending and the statement of member's equity—income tax basis for the year then ending in accordance with the income tax-basis of accounting, and for determining that the income tax-basis of accounting is an acceptable financial reporting framework. We have performed compilation engagements in accordance with *Statements on Standards for Accounting and Review Services* promulgated by the Accounting and Review Services Committee of the AICPA. We did not audit or review the financial statements nor were we required to perform any procedures to verify the accuracy or completeness of the information provided by management. Accordingly, we do not express an opinion, a conclusion, nor provide any form of assurance on these financial statements.

The financial statements are prepared in accordance with the income tax-basis of accounting, which is a basis of accounting other than accounting principles generally accepted in the United States of America.

Management has elected to omit substantially all the disclosures ordinarily included in financial statements prepared in accordance with the income tax-basis of accounting. If the omitted disclosures were included in the financial statements, they might influence the user's conclusions about Creekside Cancer Care, LLC's assets, liabilities, equity, revenue, and expenses. Accordingly, the financial statements are not designed for those who are not informed about such matters.

Other Matter

After the December 31 financial statements were issued, the tax return was prepared. It was determined that bonus depreciation should not be taken. An adjustment of $20,618 was made to prior year retained earnings and accumulated depreciation. This change is reflected in the statement of owner's equity – income tax-basis and on the statement of assets, liabilities and member's equity – income tax basis.

The schedule of operating expenses—income tax basis is presented for purposes of additional analysis and is not a required part of the basic financial statements. This information is the representation of management. The information was subject to our compilation engagement, however, we have not audited or reviewed the information and, accordingly, do not express an opinion, a conclusion, nor provide any assurance on such information.

*Anderson & Whitney P. C.*

February 22, 2017

-1-

**CREEKSIDE CANCER CARE, LLC**

## STATEMENT OF ASSETS, LIABILITIES, AND MEMBER'S EQUITY - INCOME TAX BASIS

| December 31 | 2016 |
|---|---|
| ASSETS | |
| Current Assets: | |
| Cash and equivalents | $ 78,347 |
| Total Current Assets | 78,347 |
| Property and Equipment: | |
| Computers and office equipment | 285,300 |
| Machinery and equipment | 8,377,076 |
| Leasehold improvements | 1,315,511 |
| Building | 2,053,063 |
| | 12,030,950 |
| Less:  Accumulated depreciation | 8,165,854 |
| Total Property and Equipment | 3,865,096 |
| Other Assets: | |
| Loan acquistion costs, net of amortization of $88,948 | 133,633 |
| Total Other Assets | 133,633 |
| TOTAL ASSETS | $ 4,077,076 |
| | |
| LIABILITIES | |
| Current Liabilities: | |
| Payroll liabilities | $ 1,174 |
| Short-term financing | 559,685 |
| Current portion of: | |
| Long-term debt | 464,562 |
| Capital lease obligations | 169,002 |
| Total Current Liabilities | 1,194,423 |
| Long-Term Debt | 6,078,503 |
| Capital Lease Obligations | 229,961 |
| Total Long-Term Liabilities | 6,308,464 |
| Total Liabilities | 7,502,887 |
| MEMBER'S EQUITY (DEFICIT) | (3,425,811) |
| TOTAL LIABILITIES AND MEMBER'S EQUITY | $ 4,077,076 |

See Accompanying Independent Accountants' Compilation Report.

**CREEKSIDE CANCER CARE, LLC**

**STATEMENT OF MEMBER'S EQUITY - INCOME TAX BASIS**

| Year Ended December 31, 2016 | | Member's Equity (Deficit) |
|---|---|---|
| Balance, January 1, 2016, as previously reported | $ | (3,173,141) |
| Prior period adjustment | | 20,617 |
| Balance, January 1, 2016, as restated | | (3,152,524) |
| Member contributions | | 1,326,721 |
| Member distributions | | (142,593) |
| Net loss for the year ended December 31, 2016 | | (1,457,415) |
| Balance, December 31, 2016 | $ | (3,425,811) |

See Accompanying Independent Accountants' Compilation Report.

-3-

**CREEKSIDE CANCER CARE, LLC**

**STATEMENTS OF REVENUE AND EXPENSES - INCOME TAX BASIS**

| Quarter and Year Periods Ended December 31, 2016 | Quarter | Year |
|---|---|---|
| Patient Fees | $ 345,888 | $ 1,538,336 |
| Total Revenue | 345,888 | 1,538,336 |
| Operating Expenses | 416,468 | 1,514,156 |
| Depreciation and Amortization Expense | 253,083 | 1,008,228 |
| Total Operating Expenses | 669,551 | 2,522,384 |
| Net Income (Loss) from Operations | (323,663) | (984,048) |
| Other Income (Expense): | | |
| Other income | - | 57,042 |
| Interest expense | (72,693) | (530,409) |
| Total Other Income (Expense) - Net | (72,693) | (473,367) |
| NET INCOME (LOSS) | $ (396,356) | $ (1,457,415) |

See Accompanying Independent Accountants' Compilation Report.

**CREEKSIDE CANCER CARE, LLC**

## STATEMENTS OF CASH FLOWS - INCOME TAX BASIS

| Quarter and Year Periods Ended December 31, 2016 | Quarter | Year |
|---|---|---|
| Cash Flows From Operating Activities: | | |
| Net income (loss) | $ (396,356) | $ (1,457,415) |
| Adjustments: | | |
| Depreciation | 253,083 | 1,008,228 |
| Income from forgiveness of debt | - | (25,000) |
| (Increase) decrease in: | | |
| Employee advances | 110 | 800 |
| Increase (decrease) in: | | |
| Payroll liabilities | (2,736) | (5,397) |
| Net Cash Used by Operating Activities | (145,899) | (478,784) |
| Cash Flows From Investing Activities: | | |
| Purchase of property and equipment | (19,150) | (31,242) |
| Net Cash Used by Investing Activities | (19,150) | (31,242) |
| Cash Flows From Financing Activities: | | |
| Payment of loan acquisition costs | - | (16,300) |
| Principal payments on: | | |
| Short-term financing | (83,052) | (548,544) |
| Lease obligations | (33,283) | (170,254) |
| Long-term debt | (94,124) | (445,242) |
| Advances on: | | |
| Short-term financing | - | 161,000 |
| Long-term debt | 262,300 | 312,300 |
| Distributions to owner | - | (142,593) |
| Contributions from owner | 159,983 | 1,326,721 |
| Net Cash Provided by Financing Activities | 211,824 | 477,088 |
| Net Increase (Decrease) in Cash | 46,775 | (32,938) |
| Cash, Beginning of Period | 31,572 | 111,285 |
| Cash, End of Period | $    78,347 | $    78,347 |
| Noncash Financing and Investing Activities: | | |
| Short-term debt forgiven | $    - | $    25,000 |

See Accompanying Independent Accountants' Compilation Report.

ADDITIONAL INFORMATION

**CREEKSIDE CANCER CARE, LLC**

## Schedules of Operating Expenses - Income Tax Basis

| Quarter and Year Periods Ended December 31, 2016 | Quarter | Year |
|---|---|---|
| Advertising | $ 5,307 | $ 47,715 |
| Bank Charges | 1,137 | 5,513 |
| Diction and Other Services | 59,096 | 328,859 |
| Dues and Subscriptions | - | 415 |
| Employee Benefits and Training | - | 3,333 |
| Insurance | 22,589 | 103,919 |
| Legal and Professional Fees | 91,400 | 150,578 |
| Miscellaneous | 217 | 463 |
| Office Expense | 15,952 | 49,533 |
| Rent | 41,336 | 202,230 |
| Supplies | 29,983 | 122,009 |
| Repairs and Maintenance | 35,468 | 136,136 |
| Taxes and Licenses | 68,411 | 86,575 |
| Travel and Entertainment | 2,024 | 13,278 |
| Utilities | 25,039 | 106,806 |
| Wages and Payroll Taxes | 18,509 | 156,794 |
| Total Operating Expenses | $ 416,468 | $ 1,514,156 |

See Accompanying Independent Accountants' Compilation Report.

# CREEKSIDE CANCER CARE, LLC.

## FINANCIAL STATEMENTS
## AND
## ADDITIONAL INFORMATION
### (Income Tax Basis)

Quarter and Year-to-Date Periods Ended December 31, 2015

# TABLE OF CONTENTS

Independent Accountants' Compilation Report ............................................................................1

STATEMENT OF ASSETS, LIABILITIES, AND MEMBER'S EQUITY - INCOME TAX BASIS ................................................................................................................................2

STATEMENT OF MEMBER'S EQUITY - INCOME TAX BASIS ................................................3

STATEMENTS OF REVENUE AND EXPENSES - INCOME TAX BASIS..............................4

STATEMENTS OF CASH FLOWS - INCOME TAX BASIS………………………………..5

ADDITIONAL INFORMATION:

   Schedules of Operating Expenses - Income Tax Basis.................................................................7



A Professional Corporation of
Certified Public Accountants

Independent Accountant's Compilation Report

Creekside Cancer Care, LLC
LaFayette, Colorado

Management is responsible for the accompanying financial statements of Creekside Cancer Care, LLC, which comprise the statements of assets, liabilities, and member's equity—income tax-basis as of December 31, 2015 and the related statements of revenue and expenses—income tax-basis and cash flows—income tax-basis for the quarter and year then ended and the statement of member's equity—income tax basis for the year then ended in accordance with the income tax-basis of accounting, and for determining that the income tax-basis of accounting is an acceptable financial reporting framework. We have performed compilation engagements in accordance with *Statements on Standards for Accounting and Review Services* promulgated by the Accounting and Review Services Committee of the AICPA. We did not audit or review the financial statements nor were we required to perform any procedures to verify the accuracy or completeness of the information provided by management. Accordingly, we do not express an opinion, a conclusion, nor provide any form of assurance on these financial statements.

The financial statements are prepared in accordance with the income tax-basis of accounting, which is a basis of accounting other than accounting principles generally accepted in the United States of America.

Management has elected to omit substantially all the disclosures ordinarily included in financial statements prepared in accordance with the income tax-basis of accounting. If the omitted disclosures were included in the financial statements, they might influence the user's conclusions about Creekside Cancer Care, LLC's assets, liabilities, equity, revenue, and expenses. Accordingly, the financial statements are not designed for those who are not informed about such matters.

Management informed us of errors in the previously issued financial statements for September 30, 2015 and October 31, 2015 in that loan proceeds of $196,212 and $75,000, respectively, were included in income rather than liabilities. Corrections for these errors are reflected in the accompanying financial statements.

Other Matter

The schedule of operating expenses—income tax basis is presented for purposes of additional analysis and is not a required part of the basic financial statements. This information is the representation of management. The information was subject to our compilation engagement, however, we have not audited or reviewed the information and, accordingly, do not express an opinion, a conclusion, nor provide any assurance on such information.

We are not independent with respect to Creekside Cancer Care, LLC as during the year ended December 31, 2015 we performed the management function of making adjustments to various general ledger account balances.

January 12, 2016

-1-

# CREEKSIDE CANCER CARE, LLC

## STATEMENT OF ASSETS, LIABILITIES, AND MEMBER'S EQUITY - INCOME TAX BASIS

| December 31 | | 2015 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and equivalents | $ | 111,285 |
| Employee Advances | | 800 |
| Total Current Assets | | 112,085 |
| Property and Equipment: | | |
| Computers and office equipment | | 285,300 |
| Machinery and equipment | | 8,364,984 |
| Leasehold improvements | | 1,296,361 |
| Building | | 2,053,063 |
| | | 11,999,708 |
| Less:  Accumulated depreciation | | 7,216,231 |
| Total Property and Equipment | | 4,783,477 |
| Other Assets: | | |
| Loan acquistion costs, net of amortization of $50,961 | | 155,320 |
| Total Other Assets | | 155,320 |
| TOTAL ASSETS | | $ 5,050,882 |
| **LIABILITIES** | | |
| Current Liabilities: | | |
| Payroll liabilities | $ | 6,571 |
| Short-term financing | | 972,232 |
| Current portion of: | | |
| Long-term debt | | 465,384 |
| Capital lease obligations | | 184,773 |
| Total Current Liabilities | | 1,628,960 |
| Long-Term Debt | | 6,210,621 |
| Capital Lease Obligations | | 384,442 |
| Total Long-Term Liabilities | | 6,595,063 |
| Total Liabilities | | 8,224,023 |
| MEMBER'S EQUITY (DEFICIT) | | (3,173,141) |
| TOTAL LIABILITIES AND MEMBER'S EQUITY | | $ 5,050,882 |

See Accompanying Independent Accountants' Compilation Report.

**CREEKSIDE CANCER CARE, LLC**

**STATEMENT OF MEMBER'S EQUITY - INCOME TAX BASIS**

| Year Ended December 31, 2015 | Member's Equity (Deficit) |
|---|---|
| Balance, January 1, 2015 | $ (2,051,468) |
| Member contributions | 111,741 |
| Member distributions | (45,943) |
| Net loss for the year ended December 31, 2015 | (1,187,471) |
| Balance, December 31, 2015 | $ (3,173,141) |

See Accompanying Independent Accountants' Compilation Report.

**CREEKSIDE CANCER CARE, LLC**

**STATEMENTS OF REVENUE AND EXPENSES - INCOME TAX BASIS**

| Quarter and Year Periods Ended December 31, 2015 | Quarter | Year |
|---|---|---|
| Patient Fees | $ 532,834 | $ 2,330,619 |
| Total Revenue | 532,834 | 2,330,619 |
| Operating Expenses | 425,474 | 1,732,139 |
| Depreciation and Amortization Expense | 304,789 | 1,121,848 |
| Total Operating Expenses | 730,263 | 2,853,987 |
| Net Income (Loss) from Operations | (197,429) | (523,368) |
| Other Income (Expense): | | |
| Interest income | - | 1,066 |
| Other income | 21,163 | 31,410 |
| Interest expense | (359,611) | (696,579) |
| Total Other Income (Expense) - Net | (338,448) | (664,103) |
| NET INCOME (LOSS) | $ (535,877) | $ (1,187,471) |

See Accompanying Independent Accountants' Compilation Report.

-4-

## CREEKSIDE CANCER CARE, LLC

## STATEMENTS OF CASH FLOWS - INCOME TAX BASIS

| Quarter and Year Periods Ended December 31, 2015 | Quarter | Year |
|---|---|---|
| Cash Flows From Operating Activities: | | |
| Net income (loss) | $ (535,877) | $ (1,187,471) |
| Adjustments: | | |
| Depreciation | 304,789 | 1,121,848 |
| Increase (decrease) in: | | |
| Advance to employee | (800) | (800) |
| Payroll liabilities | 1,607 | 4,343 |
| Net Cash Used by Operating Activities | (230,281) | (62,080) |
| Cash Flows From Investing Activities: | | |
| Purchase of property and equipment | (29,268) | (132,185) |
| Net Cash Used by Investing Activities | (29,268) | (132,185) |
| Cash Flows From Financing Activities: | | |
| Payments on: | | |
| Loan fees | - | (5,000) |
| Principal payments on: | | |
| Short-term financing | (77,533) | (399,125) |
| Lease obligations | (60,686) | (894,444) |
| Long-term debt | (92,160) | (302,365) |
| Advances on: | | |
| Short-term financing | 370,447 | 870,459 |
| Long-term debt | 125,077 | 125,077 |
| Distributions to owner | (45,943) | (45,943) |
| Contributions from owner | 27,200 | 111,740 |
| Net Cash Provided/(Used) by Financing Activities | 246,402 | (539,601) |
| Net Decrease in Cash | (13,147) | (733,866) |
| Cash, Beginning of Period | 124,432 | 845,151 |
| Cash, End of Period | $ 111,285 | $ 111,285 |
| | | |
| Noncash Financing and Investing Activities: | | |
| Loan fees financed with loan proceeds | $ 87,000 | $ 87,000 |
| Short-term note refinanced | - | 176,199 |
| Capital lease refinanced with long term debt | 1,767,923 | 1,767,923 |

See Accompanying Independent Accountants' Compilation Report.

ADDITIONAL INFORMATION

**CREEKSIDE CANCER CARE, LLC**

**Schedules of Operating Expenses - Income Tax Basis**

| Quarter and Year Periods Ended December 31, 2015 | Quarter | Year |
|---|---:|---:|
| Advertising | $   13,489 | $   139,144 |
| Bank Charges | 6,995 | 11,044 |
| Charitable Contributions | - | 2,000 |
| Diction and Other Services | 119,611 | 390,842 |
| Disposal Fees | - | 2,207 |
| Dues and Subscriptions | 249 | 3,468 |
| Employee Benefits and Training | 1,920 | 19,498 |
| Insurance | 29,409 | 115,360 |
| Janitorial | 8,099 | 28,652 |
| Legal and Professional Fees | 14,100 | 67,641 |
| Miscellaneous | 14 | 4,987 |
| Office Expense | 12,026 | 29,760 |
| Rent | 61,919 | 181,235 |
| Supplies | 30,985 | 82,031 |
| Repairs and Maintenance | 22,373 | 70,765 |
| Taxes and Licenses | 10,604 | 89,656 |
| Travel and Entertainment | 3,447 | 11,400 |
| Utilities | 22,976 | 136,894 |
| Wages and Payroll Taxes | 67,258 | 345,555 |
| Total Operating Expenses | $  425,474 | $  1,732,139 |

See Accompanying Independent Accountants' Compilation Report.

## EXHIBIT C

**FINANCIAL PROJECTIONS**

**[FORTHCOMING]**

**<u>EXHIBIT D</u>**

**LIQUIDATION ANALYSIS**

**[FORTHCOMING]**