IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
The Honorable Michael E. Romero

| | |
|---|---|
| In re:<br><br>Creekside Cancer Care, LLC<br><br>Debtor. | Case No. 16-21943 MER<br><br>Chapter 11 |

**ACCURAY INCORPORATED'S BRIEF ON THE NATURE OF CONTRACT WITH DEBTOR: LEASE**

Accuray Incorporated and its wholly owned subsidiary TomoTherapy Incorporated (collectively, "Accuray"), by and through undersigned counsel Michael J. Davis of DLG Law Group LLC, respectfully file this Brief On The Nature Of Contract With Debtor: Lease and, in support thereof, states as follows:

BACKGROUND

I.   **Factual Background**

On September 30, 2011, Accuray and Creekside Cancer Care, LLC ("Debtor") (collectively, "the Parties") entered into the Accuray TomoHD System Shared Ownership Agreement ("the Agreement").  Ex. A (State Court Amended Complaint) ¶ 13; Ex. B (State Court Answer to Amended Complaint) ¶ 13; *see also* Ex. C (Agreement) at 22.  Under the Agreement, Accuray, through its subsidiary TomoTherapy Incorporated, agreed to provide Creekside a TomoTherapy TomoHD System ("TomoHD" or "equipment") and a modular bunker to house the TomoHD in Creekside's facility.  Ex. A ¶¶ 9, 14-15; Ex. B ¶¶ 9, 14-15; *see generally* Ex. C.[1]  On December 22, 2011, the Parties executed Amendment Two to Accuray TomoHD System Shared Ownership Agreement ("Amendment Two"), whereby they agreed to revise the

---

[1]Accuray is a radiation oncology company that develops, manufactures and sells precise, innovative tumor treatment solutions.  Ex. A  ¶ 8; Ex. B ¶ 8.  Debtor operates a non-hospital facility in Lafayette, CO, which offers cancer treatments.  Ex. A ¶ 12; Ex. B ¶ 12.  The TomoHD System is one particular configuration of a radiation treatment system for cancer called TomoTherapy that Accuray and TomoTherapy developed.  Ex. A ¶¶ 10-11; Ex. B ¶¶ 10-11.

1

Agreement's payment terms to reflect an original price for the TomoHD of $3,030,200 and for the bunker of $445,093.  Ex. A ¶ 28; Ex. B ¶ 28; *see also* Ex. D (Amendment Two).

Under the Agreement, Debtor was obligated to make three types of payments to Accuray: (1) down payments in the total amount of $80,000; (2) minimum monthly payments of $60,000, regardless of Debtor's revenue from the TomoHD; (3) and shared revenue payments, based on total fees generated using the TomoHD.  Ex. A ¶ 16; Ex. B ¶ 16; *see also* Ex. C at 5-7.  Debtor made the down payments concurrent with execution of the Agreement.  Ex. A ¶ 17; Ex. B ¶ 17.  Accuray asserts that, since September 2012, Debtor failed to make any minimum monthly payments or revenue share payments as required by the Agreement.  Ex. A ¶ 31.  Debtor asserts that it made one monthly payment in September 2014.  Ex. E (Creekside Cancer Care, LLC's Responses to Plaintiff's First Set of Discovery Requests) at 6 (response to ¶ 31).

The Agreement contains a buyout provision which allows Debtor to pay the "Remaining System Price" at any time and obtain ownership rights in the TomoHD and modular bunker.  Ex. A ¶¶ 18-19; Ex. B ¶¶ 18-19; *see also* Ex. C at 7-8.  Amendment Two includes an amortization schedule which lays out Debtor's buyout balances for the TomoHD and the modular bunker on a monthly basis, assuming that Debtor makes its minimum payments.  Ex. C at 8; Ex. D.  Debtor exercised its buyout option on the modular bunker in August 2016.  Ex. A ¶ 37; Ex. B ¶ 37.  Debtor never exercised its buyout option for the TomoHD.  Ex. A ¶ 38; Ex. B ¶ 38.

The Agreement includes the following relevant provisions:

14. **Buyout.**  At any time following the Commencement Date, upon sixty (60) days prior written notice to Accuray, Customer shall be entitled to pay all amounts outstanding under this Agreement (the "Buyout Price") in respect of the Accuray Deliverables ("the Buyout Option").  The Buyout Price shall be calculated on a monthly basis as follows:

14.1. Prior to the Commencement Date, the Buyout Price shall be equal to the Remaining System Price indicated in the Quotation.

      14.2    In each month following the Commencement Date, the Buyout Price shall be calculated by subtracting from the previous month's Buyout Price, that portion of the total monthly payments, comprised of the Minimum Monthly Payment plus the Revenue Share Payments (together, the "Aggregate Monthly Payment"), made in such month which are attributable to principal. The portion of the Aggregate Monthly Payment made in any month which is attributable to principal shall be calculated by multiplying the prior month's Buyout Price by one-twelfth of the Interest Rate, and subtracting such amount from the amount of the Aggregate Monthly Payment.

              Following payment by Customer to Accuray of the Buyout Price, Customer shall have no further payment obligations under this Agreement, other than payments due in respect of Accuray Services. Please see Attachment B hereto for an example of the calculation of the Buyout Price based on a hypothetical first payment date and hypothetical revenue generated by the Customer. The calculations reflected on Attachment B are for purposes of clarification and example only; Customer's actual Buyout Price will depend on the aggregate payments made to Accuray under this Agreement and the amount of Technical Fees collected by the Customer each month. Please note that in the example set forth in Attachment B, the Remaining System Price would be paid in full after 60 months, at which point the Agreement would terminate in accordance with Section 19.1(d).

Ex. C at 7-8.

      24.    **Insurance.**

      24.1    For the Term of this Agreement, Accuray shall, at its sole cost and expense, maintain product liability and property damage insurance covering the Accuray Deliverables with the following minimum coverage: Basic liability and product liability of One Million Dollars ($1,000,000); equipment coverage at replacement value; and a liability umbrella policy of Three Million Dollars ($2,000,000). A certificate evidencing such coverage shall be provided by Accuray to Customer upon request by Customer.

*Id.* at 12.

      28.6.    **Governing Law.** The rights and obligations of the parties under this Agreement shall be governed in all respects by the laws of the United States and the State of California without regard to conflicts of laws principles that would require the application of the laws of any other jurisdiction. No action, regardless of form, arising out of or related to any

> Accuray Deliverables may be brought by Customer more than 1 year after Customer has or should have become aware of the cause of action.

*Id.* at 12.

> **30.** **Term**
>
> **30.1** The term of this Agreement (the "Term") shall expire on the earlier of: (a) the date that is five (5) years from the Commencement Date, (b) the effective date upon which Customer exercises its Buyout Option in accordance with Section D.3 (Buyout), (c) termination of this Agreement in connection with a breach of this Agreement as permitted pursuant to Section D.23, or (d) the date on which Customer's total Aggregate Monthly Payments paid to Accuray (together with any other payments of principal made by Customer to Accuray for the Accuray Deliverables) equal the full amount of the Remaining System Price set forth in the Quotation plus applicable interest, where the Interest Rate is applied on a monthly basis. In the event of a termination of this Agreement pursuant to either of clauses (b) or (d) above, title to the Accuray Deliverables shall transfer to Customer in accordance with Section D.30.2 below. At the expiration of the Term pursuant to clause (a) above, Customer may choose to:
>
>> (I) buyout the Accuray Deliverables in accordance with Section D.3 (Buyout),
>>
>> (II) return the Accuray Deliverables to Accuray, or
>>
>> (III) extend the Term of this Agreement if agreed to by Accuray, provided, however, that nothing contained herein shall in any way obligated Accuray to extend the Term of this Agreement at the expiration of such Term.

*Id.* at 15-16.

> **31.** **Ownership, Title and Security Interest**
>
> **31.1** Until (i) the effective date upon which Customer exercises its Buyout Option in accordance with Section D.3 (Buyout) above, or (ii) the date at which Customer's Aggregate Monthly Payments to Accuray (together with any other payments of principal made by Customer to Accuray for the Accuray Deliverables) equal the full amount of the Remaining System Price set forth in the Quotation above plus applicable interest, where the Interest Rate is applied on a monthly basis, all Accuray Deliverables are and shall remain the sole exclusive (personal) property of Accuray (or such leasing company or other entity to which Accuray elects to transfer

4

title in connection with the financing of the Accuray Deliverables and the monthly income stream from such items) and at all times be and remain personal property notwithstanding that it or any part of it may be, or hereafter becomes, in any manner affixed or attached to real property or any building thereon.

**20.2** Accuray shall retain ownership rights in all Accuray Deliverables and shall have a right to claim proceeds generated by Customer therefrom in order to secure payment for such deliverables by Customer (collectively, a "Security Interest"), it being understood that such Security Interest hereby granted by Customer to Accuray includes, but is not limited to, the retention of all right in and title to the Accuray Deliverables delivered to Customer. Customer shall execute upon Accuray's request, and permit Accuray to file, documents and related filings and recordings required to evidence Accuray's Security Interest in the Accuray Deliverables and related proceeds, including without limitation the right of Accuray to repossess the Accuray Deliverables in the event Customer defaults on its payment obligations hereunder and realize the full benefit of protections available under applicable laws in the jurisdiction where the Accuray System is installed in order to secure Accuray's interest in the Accuray Deliverables until Payment is received in full from Customer. Customer shall maintain the Accuray Deliverables in good condition and keep such deliverables free of any liens, encumbrances, and other third party rights until payment to Accuray is made in full. In the event of a third party claim against Accuray Deliverables while subject to Accuray's Security Interest, Customer shall immediately notify Accuray of such claim and advise the third party of Accuray's ownership interest in the Accuray Deliverables. If Customer breaches this Agreement due to failure to satisfy its payment obligations as provided herein, Customer shall, upon demand by Accuray, immediately return to Accuray all Accuray Deliverables at Customer's cost and expense. All security interests shall be released by Accuray and title to the Accuray Deliverables (with exception of licensed intellectual property products) shall pass directly from Accuray to Customer (i) on the date on which Customer's total Aggregate Monthly Payments to Accuray (together with any other payments of principal made by Customer to Accuray for the Accuray Deliverables) equal the full amount of the Remaining System Price set forth in the Quotation plus applicable interest, where the Interest Rate is applied on a monthly basis or (ii) on the effective date upon which Customer exercises its Buyout Option in accordance with Section D.3 (Buyout) above. Customer authorizes Accuray to file, and shall execute upon Accuray's request, documents and related filings and recordings thereof as necessary for Accuray to perfect the foregoing Security Interest under the uniform Commercial Code or any similar domestic or foreign laws4 and agrees to help Accuray secure financing from a financing entity using the Accuray Deliverables and Customer's obligations under this

> Agreement as collateral, it being understood that such financing will not require any obligation from Customer other than those required in this Agreement.

*Id.* at 16-17.

## II. **Procedural Background**

On August 1, 2016, Accuray filed a Complaint against Debtor in District Court, Boulder County, Colorado, seeking to recover the TomoHD in replevin and for breach of contract due to Creekside's failure to make the monthly payments required under the Agreement. Ex. F (Docket, Case No. 2016CV30896).[2] Accuray disclosed the testimony of non-retained expert Stanley Gee who stated as follows in relation to the value of the equipment:

> Mr. Gee will opine on the fair market value of TomoHD equipment. Specifically, Mr. Gee will offer an opinion that the fair market value of a refurbished TomoHD System such as the one in Creekside's possession is $1,595,000.00, based on Mr. Gee's knowledge of the market for refurbished TomoHD equipment and an internal review of sales data on similar systems.

Ex. H (Plaintiffs' C.R.C.P. 26(A)(2) Expert Disclosures).

On December 9, 2016, on the eve of trial with Accuray, Debtor filed a petition for relief under Chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code") with this Court. (ECF No. 1). Debtor is operating as a debtor-in-possession pursuant to section 1107 and 1108 of the Bankruptcy Code. The Debtor listed the claim of TomoTherapy Incorporated as being a secured claim of $2,600,000. Schedule D (ECF No. 97).

On March 1, 2017, Accuray filed a Motion for Relief from Automatic Stay or, Alternatively, for Adequate Protection ("the Motion") (ECF No. 115). In response to discovery in connection with that Motion, Accuray declared that the fair market value of the TomoHD as

---

[2] On September 21, 2016, the Court held a Show Cause Hearing on Accuray's replevin claim. The Court denied the replevin claim due to potential damage to Debtor's property from removal but found that "it is more likely than not that Defendant has not complied with the terms of the Agreement" and "has failed to make payments in a timely manner." Ex. G (Show Cause Order). "To ensure Plaintiffs would not incur significant loss of use of the TomoHD in the event it prevails, the Court set the matter for trial within three months of the September 21, 2016 hearing." *Id.*

of the date of the Motion was $1,600,000; that its useful life was 84 months; and that it was depreciating at a rate of approximately $59,260 per month. Ex. I (Tomotherapy Incorporated's Responses to Debtor's First Set of Interrogatories and Requests for Production) at 2. On March 29, 2017, the Parties appeared before this Court for a preliminary hearing on the Motion and Debtor's Response. At that hearing, the Court determined it was necessary to first decide whether contract between Debtor and Accuray was a lease or a disguised financing arrangement and ordered the Parties to brief the issue. *See* Minute Order (ECF No. 138).

## ARGUMENT

**I.** **Legal Standard: Lease Versus Security Agreement**

State law determines whether an agreement constitutes a lease or a security agreement. *In Re QDS Components, Inc.*, 292 B.R. 313, 321 (Bankr. S.D. Ohio 2002). Since the Agreement contains a California choice of law provision, and the parties have not opposed its application, California law governs. *Id.* California adopted the uniform version of Uniform Commercial Code (UCC) § 1-203, which reads in relevant part as follows:

(a) Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case.
(b) A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:
    (1) the original term of the lease is equal to or greater than the remaining economic life of the goods;
    (2) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
    (3) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or
    (4) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

Ca. Com. Code § 1203(a)-(b).[3]

> One commentator has distinguished a lease, a sale, and a secured transaction as follows:
>
> A lease involves payment for the temporary possession, use and enjoyment of goods, with the expectation that the goods will be returned to the owner with some expected residual interest of value remaining at the end of the lease term. In contrast, a sale involves an unconditional transfer of absolute title to goods, while a security interest is only an inchoate interest contingent on default and limited to the remaining secured debt.

*QDS*, 292 B.R. at 322 (citing James J. White & Robert S. Summers, *Uniform Commercial Code* vol. 4, § 30-3, 14 n. 18 (5th ed., West 2002)). The hallmark of a true lease is that there is something of value to give back to the lessor at the end of the lease term. *Id*.

The focus of a UCC § 1-203 analysis is on the facts of each case and that the Court must "apply sequentially two distinct tests." *In re WorldCom, Inc.*, 339 B.R. 56, 64 (Bankr. S.D.N.Y. 2006) (referring to UCC § 1-201(37)). The first such test is the "'Bright-Line Test' designed to provide the courts with a per se standard." *Id*. at 65. If the lease is not terminable by the lessee and one or more enumerated conditions is present, then the contract is a *per se* security agreement, and the court's analysis may conclude. *In re Lash*, 10-51171 (Bankr. M.D.N.D. Dec. 9, 2010) at *8. The four UCC § 1-203(b) factors have been referred to as the "residual value factors" because they each relate to whether residual value remains for the lessor at the end of the lease. *In Re PSINet, Inc.*, 271 B.R. 1 (Bankr. S.D.N.Y. 2001).

"The second test, to be applied if the Bright-Line Test is not satisfied, is a contextual analysis that asks the court to determine whether 'the facts of each case' demonstrate that a security interest was created." *WorldCom, Inc.*, 339 B.R. at 65. The key question for this second test is "whether the lessor retains a meaningful residual interest at the end of the least term." *QDS*, 292 B.R. at 333 (internal citation and quotation marks omitted). California case law

---

[3] This section was last amended effective January 1, 2007. This section is the successor to UCC Section 1-201(37).

8

provides that two features of a lease must be examined in light of the question whether the lessor has relinquished its reversionary interest: "(1) any option to purchase and (2) any provision for the lessee's acquisition of equity in the goods." *Addison v. Burnett*, 41 Cal.App.4th 1288, 1296 (Cal. Ct. App. 1996).

Courts faced with the lease versus security interest issue may look to relevant decisions from other jurisdictions, since the UCC has been adopted in all fifty states, and its purpose is to achieve uniformity. *See Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1174 n.7 (10th Cir. 2008) ("In the UCC context, decisions from other jurisdictions are particularly persuasive due to the uniform nature of the UCC"). Nonetheless, the issue of true lease versus installment sales contract has been characterized as "one of the most vexatious and oft-litigated issues under the Uniform Commercial Code. As a result, the case law is comprised of a disjointed patchwork of decisions that simply cannot be reconciled." *In re UNI Imaging Holdings, LLC*, 423 B.R. 406, 414 (Bankr. N.D.N.Y. 2010) (quoting *QDS Components*, 292 B.R. at 323, 329) (internal citation and quotation marks omitted).

Ordinarily, the party seeking to ask the Court to characterize an agreement as "other than what it purports to be" bears the burden of proof. *See, e.g.*, *In re Murray*, 191 B.R. 309, 316 (Bankr.E.D.Pa.1996); *In re Edison Bros. Stores, Inc.*, 207 B.R. 801, 812 & n. 14 (Bankr.D.Del.1997) (imposing the burden of proof on the debtor "as the party seeking to characterize the Lease Agreement as an instrument other than a lease"). In this case, the Agreement doesn't purport to be either a lease or a finance agreement.

II.     **Agreement Is Not A Security Interest Under Per Se Test**

Accuray does not assert that the Agreement is subject to termination by Debtor. Rather, the Agreement is not a disguised finance agreement because none of the four residual factors are

met.  First, there is no dispute that the TomoHD retained some useful life beyond the Term of the Agreement.  Second, Debtor was under no obligation either to renew the lease for the remaining economic life of the TomoHD or to purchase it.  Third, the Agreement does not give Debtor the option to renew the lease for nominal additional consideration.  Fourth, the Agreement does not allow Debtor to purchase the TomoHD for nominal additional consideration.

### A. Equipment Retains Useful Life Beyond Term of Agreement

The TomoHD retains at least two years of useful life beyond the Term of the Agreement.  TomoTherapy Incorporated's responses to Debtor's discovery requests indicate that the "expected useful life" of the TomoHD is "Approximately 84 months from time of installation."  The Agreement's Term is no longer than five years, or sixty (60) months, from the time of first use.  Ex. C at 15-16 (¶ 30.1).  In other words, the useful life of the equipment is at least two years, or twenty four (24) months from the end Term of the Agreement.  The equipment may be able to be maintained longer.  Therefore, the original Term of the Agreement is not equal to or greater than the remaining economic life of the goods and Accuray will receive the equipment while it still has substantial economic life.  *See In re New Items Co., Inc*., 72 B.R. 1017, 1019 (Bankr. N.D.Ohio 1987) ("the principal characteristic of a lease is that it allows the lessee the right to use the property for a period substantially less than its economic life, with an attendant obligation to return the property to the lessor while it still has substantial useful life.")

### B. Debtor Is Under No Obligation To Renew Agreement For Remaining Economic Life

Under the Agreement, Debtor is not obligated to renew the Agreement for the remaining economic life of the equipment.  As discussed above, the remaining economic life of the equipment is at least two years beyond the Agreement's Term.  The Agreements provides Debtor with an option to renewal the Agreement at the end of the five year Term, though it states that

10

renewal is subject to acceptance by Accuray. Ex. C. at 15-16 (¶ 30.1). Therefore, Debtor is under no obligation to renew the Agreement for the remaining economic life of the TomoHD.

### C. Agreement Contains No Option To Renew Lease For Nominal Consideration

The Agreement also does not give Debtor the option to renew the lease for nominal additional consideration. While the Agreement provides Debtor an option to renew, as discussed above, that option is subject to acceptance or rejection on Accuray's terms. *Id.* If Accuray were to allow Debtor to renew, there is no indication in the Agreement that the consideration would be less than the value of the fair market rent. *See* Ca. Com. Code § 1203(d) ("Additional consideration is not nominal if (1) when the option to renew the lease is granted to the lessee, the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed."). Therefore, the Agreement does not provide Debtor with an option to renew for nominal consideration.

### D. Agreement Contains No Option To Purchase TomoHD For Nominal Consideration

Finally, the Agreement does not give Debtor the option to purchase the TomoHD for nominal additional consideration.

> [UCC § 1-203] sets forth two tests for determining whether an option price is nominal: (1) the option price is not nominal when the option to purchase is stated in the agreement to be the fair market value of the property (the "FMV Standard"); and (2) the option price is nominal if it is less than the lessee's reasonably predictable costs of performing under the lease agreement if the option is not exercised (the "Option Price/Performance Cost Test").

*QDS Components*, 292 B.R. at 335 (citing to UCC § 1-201(37) in the original). Even if Debtor were to exercise (or have exercised) its purchase option under the Agreement, the residual value of the TomoHD at the end of the Term is not nominal under this test.

As discussed above, Accuray predicts the fair market value of the TomoHD to be approximately $1,600,000. Ex. I at 2. According to Amendment Two, the Buyout Price at the

end of the five year Term would have been $934,877.88.[4] Ex. D at 7. Thus, the Buyout Price would be more than half (50%) of the fair market value of the equipment at the end of the Term, and roughly one-third the original value, which is much more than nominal. At no point would Debtor have had a lower Buyout Price than its lowest cost of performing under the Agreement.

By comparison, the California Court of Appeals in *Triple C. Leasing, Inc. v. All-American Mobile Wash* found ten percent (10%) of the original cost and roughly one quarter (25%) of the fair market value at the end of the lease term to be more than nominal:

> Here, the agreement provided that appellants could become the owners of the mobile van at the end of the term of the lease upon the payment of $1,040, i.e., 10 percent of the original cost. At the first private sale of the van by respondent to ESS, the van was sold for $4,000; ESS subsequently sold the van to a third party for $4,500. These prices were the only evidence of the fair market value at the time of default. There is some indication in the evidence that by the end of the term of the lease, the equipment would have depreciated to a much lower value. The indications are equivocal as to whether, within the meaning of the statute, the option price of $1,040 was 'nominal.' Therefore, the determination of the trial court is to be upheld, that the price was more than nominal and that the transaction was a true lease rather than a security device.

64 Cal.App.3d 244, 249 (Cal. Ct. App. 1976). The Bankruptcy Court for the Norther District of Alabama similarly found that a buyout option was not nominal, and an agreement was a true lease, where the buyout price represented twenty percent (20%) of the original equipment value and roughly forty percent (40%) of the price at the time of buyout. *In re Wells*, 15-80056-CRJ-13 (Bankr. N.D. Alabama, June 22, 2015) ("Whether the payment represents 20% or 38.8% of the vehicle's original value, the Court finds that the payment is not nominal using either calculation."). These opinions support that the Agreement does not contain a nominal buyout provision.

---

[4] This includes the price for both the modular bunker and the TomoHD. It also assumes that Debtor did not pay any shared revenue payments above the monthly minimum payments, which state court discovery indicated it would not have owed. Finally, it assumes that Debtor paid the minimum monthly payments, which it clearly did not. Today, the Buyout Price under the Agreement would be the full contract price, less $140,000, plus interest.

**III.     Agreement Is Not A Security Interest Under Facts and Circumstances Test**

If the Court cannot conclusively presume that the Agreement is a security agreement after applying the Bright-Line Test, it must consider the economic realities of the transaction to determine if the Agreement is a lease. *In re Earl Emerson Warne*, 09-13941, (Bankr. D. Kan. April 4, 2011). In this case, the economic reality factors favor a finding that the Agreement is a lease, rather than a security interest. First, as discussed above, the purchase option does not indicate that Accuray relinquished a reversionary interest, especially given the circumstances of this case. Second, the Agreement specifically provides that Debtor does not acquire equity in the TomoHD, unless and until it exercises its option to purchase. Additional textual considerations also mandate in favor of finding the Agreement is a lease.

   *A.  Option To Purchase Does Not Indicate Accuray Relinquished Reversionary Interest*

Analysis of the first factor is a "redundant examination of a factor necessarily considered before the court before the court may turn to the reversionary interest question." *WorldCom*, 339 B.R. at 73. As discussed above, the Agreement's Buyout Option doesn't indicate that Accuray relinquished its reversionary interest. Even if the Agreement grants Debtor an option to purchase the TomoHD, in the circumstances of this case Accuray did not relinquish its reversionary interest in the TomoHD, because Debtor did not exercise the Buyout Option. *Accord In re Brooke Capital Corp.*, 588 Fed.Appx. 834, 843 (10th Cir. 2014) ("a court must look beyond the language of the agreement to determine the true nature of the interest granted.") (citing *Fireman's Fund Ins. Co. Grover* (*In re Woodson Co.*), 813 F.3d 266, 272 (9th Cir. 1987)).

   *B.  Agreement Does Not Provide For Debtor's Acquisition Of Equity In TomoHD*

The next factor to consider in evaluating whether Accuray relinquished its reversionary interest is whether the Debtor acquired equity in the TomoHD through the Agreement, which it

13

did not. *In re Earl Emerson Warne*, 09-13941 (Bankr. D. Kan. April 4, 2011). The contract makes no provision for Debtor to acquire equity in the TomoHD. To the contrary, the Agreement affirmatively provides that until Debtor exercises its buyout or pays the Remaining System Price, "all Accuray Deliverables are and shall remain the sole exclusive (personal) property of Accuray." Ex. C at 16 (¶ 31.1). The Agreement further provides that "[i]f Customer breaches this Agreement due to failure to satisfy its payment obligations as provided herein, Customer shall, upon demand by Accuray, immediately return to Accuray all Accuray Deliverables at Customer's cost and expense." *Id.* at 17 (¶ 20.2). Finally, the Agreement provides that Accuray will maintain product liability and property damage insurance on the TomoHD during the Term of the Agreement. *Id.* at 12 (¶24.1).

There is also no indication in the Agreement that the minimum monthly payment was set higher than fair market value in order to allow Debtor to accumulate equity. In other words, there is no evidence that the $60,000 minimum monthly payment was higher than fair market value at the time the Parties entered into the Agreement. *Compare to WorldCom*, 339 B.R. at 73 ("the Court is essentially examining whether the contractual option price was set lower than the predicted FMV of the goods in order to reflect the equity interest in the goods that the lessee has previously accumulated, presumably by paying more in 'rent' than the parties would have agreed to in the absence of an interest to allow the lessee to accumulate such equity.").

C. **Alternative Test: "No Lessee in its Right Mind Test"**

Courts have also considered an additional, related question, which is whether the only economically sensible decision is for the lessee to exercise the purchase option. *In re Earl Emerson Warne*, *supra* ("If a lessee develops equity in the leased property such that the only sensible decision economically for the lessee is to exercise the option... it suggests that the lessor

14

did not expect the return of the leased goods.") (quoting *Addison*, 41 Cal. App.4th at 1296); *In re Lash*, *supra*, at *10 ("When a purchase option is involved, if the lessee's only economically sensible option is to exercise the option, then the agreement will be considered to create a security interest."). There is no indication here that Debtor's only sensible option was to exercise the purchase option. Even had debtor made its required minimum payments (which it did not), Debtor still would have had to pay nearly one million dollars ($1M) to exercise its buyout. Moreover, the particular facts of the case indicate that Debtor did not believe it was sensible, much less possible, to exercise this purchase option, given that it did not make even one monthly minimum payment after September 2012.

### D. Remaining Agreement Terms Indicate The Agreement Is A Lease

Finally, the California Courts of Appeals has also looked to the remaining terms of the Agreement to determine whether they support its construction as a lease. The court in *Addison v. Burnett* reviewed the following language, finding that its terms support construction as a true lease: "Paragraph 13 expressly states that the vehicle is 'the sole property of Lessor, and Lessee shall have no right, title or interest therein as to the ownership thereof ... and this instrument is a lease and not a contract of sale.'" 41 Cal.App.4th at 1299. This is equivalent to the language in section 31.1 of the Agreement, which provides that the TomoHD remains "the sole exclusive (personal) property of Accuray" unless and until Debtor exercises its Buyout Option or pays the full Remaining System Price, Ex. C at 16 (¶ 31.1), and that Accuray shall retain all ownership rights in the TomoHD, *id.* at 17 (¶ 20.2). While this may not be a per se indication of a lease, California law indicates it weighs in support of a finding that the Agreement is a lease.

## CONCLUSION

WHEREFORE, Accuray respectfully requests that this Court determine that the Parties' contract is a lease and grant such other relief as this Court deems just and proper.

Dated this 28 day of April, 2017.

/s/*Michael J. Davis*
Michael J. Davis
DLG Law Group LLC
4100 E. Mississippi Ave. Ste. 420
Denver, CO 80246
303-758-5100
303-758-5055 (fax)
mdavis@dlglaw.net

*Attorney for Accuray Incorporated
and Tomotherapy Incorporated*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28 day of April, 2017, a true and correct copy of the foregoing Accuray Incorporated's Brief On The Nature of Its Contract With Debtor: Lease was filed and served via PACER/ECF on the parties identified below:

Steven E. Abelman
410 Seventeenth St
22nd floor
Denver, CO 80202
(303) 223-1102
(303) 223-0902 (fax)
sabelman@bhfs.com

Samuel M. Kidder
410 17th St., Ste. 2200
Denver, CO 80202
303-223-1117
303-223-1111 (fax)
skidder@bhfs.com

Michael J. Pankow
410 17th St.
22nd Fl.
Denver, CO 80202
( ) 303-223-1100
303-223-1111 (fax)
mpankow@bhfs.com

    *Attorneys for Debtor*

Alan K. Motes
Byron G. Rogers Federal Building
1961 Stout St.
Ste. 12-200
Denver, CO 80294
303-312-7999
Alan.Motes@usdoj.gov

    *Attorney for U.S. Trustee*

    */s/Michael J. Davis*
    Michael J. Davis
    DLG Law Group LLC